Mary Benton et al., complainants,

*v.*

Elizabeth G. Kernan et al., defendants.

[Decided June 20th, 1940.]

*Mr. Israel B. Greene,* for the complainants.

*Messrs. Milton, McNulty & Augelli,* for the defendants Elizabeth G. Kernan, individually and as executrix, Louis Kernan and Kern-O-Mix, Inc.

*Mr. Stanley L. Gedney,* for the defendants Mary Kernan and Savings Investment and Trust Company, trustees under the last will and testament of Richard L. Kernan, deceased.

STEIN, V. C.

Complainants, forty-eight in number, residents in the village of South Orange, and all but one (who is a tenant) owners of their homes, brought this action to restrain the defendants from operating their trap-rock quarry and "Kern-O-Mix" business in such a manner as to constitute a nuisance. Amongst other things, they charge that their homes were shaken, jarred, and damaged, and their lives made highly uncomfortable by vibrations caused by the blasting of rock at the quarry; that the blasting cast stones upon the lands of some of them, endangering the safety of the persons thereon; and that their peace and comfort were disturbed and their health affected by the noises caused by the blasting, the operations of the stone crusher, engines, drills, steam whistle, trucks, and by nauseating odors emitted by the "Kern-O-Mix" plant and product.

After the granting of the preliminary injunction touching the matter of blasting (*Benton* v. *Kernan, 125 N. J. Eq. 412; 6 Atl. Rep. (2d) 195,* modified on doctrine of balancing of conveniences, *126 N. J. Eq. 343; 8 Atl. Rep. (2d) 719*), the complainants amended their bill alleging that the establishment of the "Kern-O-Mix" plant violated the existing zoning ordinance, and that the plant had been and was being operated as a nuisance. Under the amendment, and as an independent ground for relief, the complainants pray that the operation of the "Kern-O-Mix" plant be restrained upon the authority of *Melucci* v. *Eagan, 124 N. J. Eq. 241; 1 Atl. Rep. (2d) 452.*

The final hearing consumed many days. Near the conclusion of the case, I visited the quarry and its surroundings, in the presence of counsel for both sides, and inspected the homes of several complainants claimed to have been damaged by vibration, heard the various noises complained of from different vantage points, and experienced the vibration caused by two blasts set off on the low face of the quarry (with 135 and 115 pounds of dynamite respectively), while at the homes of complainants Given and Caverly.

In view of the importance of the case, the size of the record, and the broad issues raised by the bill which were not dealt with on the application for the preliminary injunction, it becomes necessary to review the facts, even at the risk of extending the length of this opinion.

The complainants' homes are located on a hillside, within a radius of about 1,500 feet of the quarry. The entire neighborhood is zoned as residential. The quarry use of defendants' lands is permitted because that use was being made of it when the zoning ordinance was adopted. Most of the complainants established their homes between 1931 and 1938.

The quarry property consists of about twenty-three acres of land, of which approximately four acres have been excavated.

The quarry lands are owned as tenants in common by the defendant Elizabeth G. Kernan, widow of Michael Kernan, deceased, and the defendants Mary Kernan and Savings Investment and Trust Company, as trustees under the last

will of Richard L. Kernan, deceased. These trustees have leased their interest in the quarry property to Elizabeth G. Kernan (the operator of the quarry), in consideration of the payment to them of stipulated royalties on all stone quarried from the property.

Years ago, when the quarry was established, the hillside was largely woodland. Since about 1926, however, this locality was developed for residence, the dwellings being occupied by business and professional people, whose homes have a value in the neighborhood of $25,000 to $30,000—the spread being between $15,000 and $70,000.

The defendants' method of quarrying is to remove the surface earth, after which holes are drilled in the rock with well drills, and the rock is then blasted with high explosives deposited in the holes; fragments too large to handle are broken up by light charges of dynamite, and the stone is then loaded by shovels into trucks which convey it to the crusher located on the premises, where it is crushed and separated mechanically into various sizes and then sold for commercial purposes, among others, to the defendant Kern-O-Mix, Inc.

The well drills, which are operated by a gas engine, consist of long steel bars, approximately six inches in diameter, with sharpened edge, which slowly and ryhthmically crack their way through the rock causing a pounding noise which is distinctly heard in the neighborhood. Since it takes several days to drill a hole of the required depth, these drills operate continuously throughout the entire working day.

The crusher and the steam engines which operate it, are housed in a primitive frame building not entirely enclosed. The dropping of the rock into the hopper of the crusher produces a loud clatter; and the pounding, rumbling, and grinding noises of the crusher, as it consumes the rock, is loud and deafening and creates a din in the neighborhood. The steam engines produce a loud and rhythmical "puff, puff, puff," sound, similar to that produced by a railroad locomotive, while the letting off of steam creates a hissing sound.

The trucks are loaded with crushed stone either from stock piles or from the storage bin. In the former case, the stone

is loaded by mechanical shovels which make considerable noise, and in the latter case it is dropped by gravity from the bin to the trucks below, causing a loud clatter (as the stone strikes the metal floors of the trucks), which resounds throughout the neighborhood.

The quarry operates a factory steam whistle, which produces a shrill and startling noise. The whistle is now blown about four times a day. The defendants now concede that the whistle is not necessary and that they can get along without it.

Considering the high-class residential character of the neighborhood, each of these noises is a nuisance in itself; but the medley of all of them, when the quarry is in full operation produces such din in the immediate neighborhood as to render normal conversation difficult.

As the neighborhood grew, the quarry operations, particularly the blasting and the noise, became sources of annoyance to the residents. Many complaints were made to the operators of the quarry and the village authorities, but without avail.

In the fall of 1934 there was renewed agitation against the quarry's operations. This was reported to Elizabeth G. Kernan, Mary Kernan and Savings Investment and Trust Company. Notwithstanding these complaints, the residential character of the community, and the zoning ordinance, Elizabeth G. Kernan, in the summer of 1935, organized the defendant, Kern-O-Mix, Inc., to manufacture a road surfacing product called "Kern-O-Mix" made by mixing finely crushed stone with tar, asphalt, lime dust, naphtha and other substances. That summer she erected a large steel bin and frame building, wherein to manufacture Kern-O-Mix and equipped it with a "pugmill" or mixing machine, and a high-powered gas engine to operate it. These improvements and installation cost about $20,000. The gas engine produces a roaring and humming noise, and there is evidence that the "Kern-O-Mix" plant and the trucks carrying that product, which pass the homes of the complainants, emit a nauseating odor, which complainants say has rendered their lives uncomfortable, particularly in the summertime, and in heavy weather; and

there is evidence that quantities of dust escape from the "Kern-O-Mix" plant, which dust it is said permeates the homes of some of the complainants.

The credible evidence establishes the fact that since 1935, there has been a marked increase in the quarry's operations. The blasting of rock has occurred more frequently, and has been of greater intensity; the crusher and the other machinery have operated longer hours, commencing as early as seven A. M.

In November, 1935, complainants' solicitor, who resides in the neighborhood, wrote to Elizabeth G. Kernan, complaining about the intensity of the blasting. A copy of this letter was sent to the village trustees. On or about December 27th, 1935, the president of the village replied in part: "Relief apparently lies in the application to the Court of Chancery for an injunction and is a matter in which the village should not interfere."

In the fall of 1937 thirteen of the complainants prepared a petition addressed to the village trustees, calling for relief. Before presenting it, they invited Elizabeth G. Kernan and Louis Kernan to a meeting at Mr. Given's home to discuss the matter in the hope that their grievances might be redressed in a friendly manner. At that meeting Elizabeth G. Kernan took the position that because the quarry was established before the residents acquired their homes, her rights were superior, and that, therefore, the neighbors would have to tolerate the situation. The result of the meeting was that Mrs. Kernan promised not to operate on Sundays, except in cases of emergency, to eliminate the seven o'clock whistle, and to muffle the exhaust of an engine. Except for these minor concessions, the defendants did nothing to lessen the noises and vibration of the crusher and engines, or to reduce the noise, vibration and concussion arising from the blasting. On the contrary, it appears that during the fall of 1937 and throughout 1938, the operations of the quarry increased and became more intolerable.

The most violent blast occurred on November 23d, 1938. This blast, which is admitted by the defendants, and which will be referred to as the "Thanksgiving Day Blast," rocked

the whole neighborhood. How much dynamite was used in this blast remains a mystery. The defendants' testimony on this point is a maze of lapses of memory, evasions, contradictions. Mr. Dobbins, the quarry superintendent who loaded the hole and set off the blast claims a loss of memory about the amount of dynamite used. He says that he gave a memorandum of the amount of dynamite to Louis Kernan who kept a record thereof. On cross-examination he said, "I assume that he [Louis Kernan] writes it in a book," but he had never seen the book, although he has been working there for several years. Elizabeth G. Kernan, who is in daily attendance at the quarry, disclaimed any knowledge of the amount of dynamite used on this or any other occasion, and said that that record was kept by Louis Kernan; but she, too, had never seen the book, and couldn't describe it. Dr. Rockwell, one of the defendants' experts, made an affidavit on the application for preliminary injunction in which he said that "the maximum amount of dynamite used is about 300 pounds, all in one hole," and that he had "examined the records of the amount of rock taken down as a result of the blasting. It indicates that for every pound of dynamite used six to seven tons of rock is taken from the face of the quarry." On cross-examination, however, he admitted that that statement was untrue because in fact he had never seen any such records. Based in part upon Dr. Rockwell's affidavit I had previously directed the defendants to furnish the complainants with a bill of particulars giving "the dates and hours of their blasting operations * * * the amount and kind of dynamite and other explosives used and the amount of rock dislodged by such blasts." To this the defendants Elizabeth G. Kernan, Louis Kernan and Kern-O-Mix, Inc., answered that they "do not possess the information requested." The complainants thereupon moved to suppress their defense and this motion was continued to final hearing. On the final hearing Louis Kernan produced a book purporting to contain a record of about 200 blasts dating from March 29th, 1938, to November, 1939, stating the dates and hours of the blasts and the amount of dynamite allegedly used. According to this book 300 pounds of dynamite were used in the "Thanks-

giving Day Blast." Although he claims this was his "personal record" he testified that most of the entries therein were made by Mr. Doriety, a salesman. Although Doriety testified for the defense, he did not corroborate these entries. I made a careful examination of this book. The outside covers and the pages gave every evidence that the book and its contents were fabricated and that it was a brand-new book, on the pages of which the ink was still fresh.

Now according to this book, 300 pounds of dynamite was the maximum amount used in one hole during the year 1938, and that amount had been used only on three occasions before the "Thanksgiving Day Blast." Yet in his affidavit, on the application for preliminary injunction, Louis Kernan stated that "the quantity of powder used * * * on said day [November 23d, 1938] was substantially less than the quantity of powder used on a number of previous occasions during 1938." If the affidavit is true, then the entries in the book must be false; and if the entries in the book are true, then his affidavit is obviously false. When pressed to explain this inconsistency, the witness · conceded that in this respect his affidavit was false.

After a careful review of the whole record, and after experiencing the jar and vibration of the two blasts, set off on December 9th, and after inspecting the quarry and the homes of the complainants, Cummings, Given, Greene and Caverly, I am satisfied that the defendants' quarry is being conducted as a nuisance.

For the sake of convenience I will consider. the evidence under several headings, to the end that there may be a separate adjudication on each grievance said to have occasioned a nuisance.

### Blasting.

It is satisfactorily established that the explosion of dynamite in blasting operations sets up vibrations (vertical and horizontal) dynamic in character, which are communicated to and transmitted through the underlying strata; each time that such vibration strikes a house, the result is a blow with

the explosive force of dynamite behind it. Any vibration of this nature, it seems to me, cannot help but do damage, and render the lives of the inhabitants of the homes most uncomfortable. These vibrations come at unexpected times and those who inhabit the homes say they are living in the fear that they may come at any time, and with a force which cannot be anticipated.

The testimony of the complainants and their witnesses is substantially unanimous to the effect that when these blasts occur their homes rock from their foundations, doors, windows and dishes rattle, pictures hung from the walls tilt and fall, and the foundation walls and plastered walls crack. The extent of the damage and annoyance can only be appreciated by a review of some of the evidence.

Frederick J. Given, an engineer, who resides at 320 Harding Drive, testified that during blasts "my house shakes very severely, the doors and windows rattle." On April 14th, 1939, during the test blasting, he "felt a very vigorous motion both from the doorjamb and from the floor. I also heard the windows of the house rattle." One of the pins of a "pin-test" set up by the defendants, fell with the first blast. The second blast caused the same kind of vibration "but perhaps not to the same degree. However, the windows rattled and the doors rattled." The witness says that on April 26th, 1939, during test-blasting, the blast "shocked and jarred the house and startled me tremendously * * * and I heard a tinkling sound * * * and noticed that the canopy of the floor lamp was oscillating * * * and producing this sound much like a bell * * * the windows rattled, and the doors rattled."

Between July 1st and September 1st, 1939, while the preliminary injunction was in effect, Mr. Given made daily inspections of his basement walls, and kept a record of his observations in which he noted the appearance of new cracks, the dates when they were first observed, their original lengths, and their extensions from time to time. He produced five drawings of sections of his main basement walls, showing that twenty-eight new cracks developed therein during these two months while the quarry was blasting. A number of

these cracks appeared on the same day the blast occurred. On several occasions, after blasting, he found new cracks in his foundation walls and pieces of cement block beneath these cracks which fitted perfectly into the new fractures. These particles were offered in evidence. The defendants made no attempt to explain away the significance of this circumstantial evidence. Mrs. Given corroborated her husband. She testified, "Well, the best way I can describe it is, it feels like an earthquake, as though my whole house is being raised off its foundation."

Elsie B. Cumming, who resides at 457 Tillou Road, testified that "At one time it felt as though the floor was removed from under me." At another time she experienced a blast which caused a picture to fall from a bookcase, and tilted other pictures on the wall. The first test blast on April 14th, "scared" her and swung open her front door, and the second blast shook her badly. On one occasion she saw a new crack develop immediately after a blast. On July 5th, 1939, a blast frightened her so that she vomited. In the summer of 1939 a blast occurred while she was sewing, and the vibration was so intense that "my knees went up into the sewing machine * * * the force of the blast knocked them up against that; and my niece was frightened." On October 11th, 1939, a blast took place while she was sitting in a chair and "I felt as though I was being knocked from my chair." On November 29th, during a blast, the lamp on her night-table rocked.

John Bernhard, a member of the bar, who resides at 13 Hoskier Road, testified that in 1939 there was a violent blast, and he called up Mr. Kernan and complained to him in strong language. In September, 1939, he experienced another terrific blast which shook the house, and "there was a suction throughout the house—it rumbled and shook, and the lamp vibrated back and forth." That day he discovered that some slate on his roof had been dislodged and was resting against the water trough. After another blast he found that an open cellar window had been jarred loose and broken. Mrs. Bernhard corroborated her husband and also testified that during a blast she heard fragments of stone "cut down through the leaves of the trees," on their property.

Mrs. Partridge, who resides at 456 Tillou Road, recalling the "Thanksgiving Day Blast" testified that she was entertaining some friends that afternoon and that the blast was so severe that her guests exclaimed and that it caused an annoying and embarrassing situation for her. After blasting, she has noticed loose plaster on the cellar floor which had fallen from the ceiling. Her cellar stairway has been jarred from its normal position, and cracks have developed in her foundation walls. The blasting has awakened her children.

Raymond N. Caverly, resides at 163 Mayhew Drive. He testified "I have been in our sun parlor at times when the blasts went off and the windows and doors rattled. And we happen to have two cocker spaniels who have become so alarmed that they would throw back their heads and howl." There were no cracks in his house when he moved in, but as time went on "a great many cracks appeared in one place or another," and although the house has been redecorated and the cracks filled in, new cracks have developed in the living room. There are also cracks in the foundation walls.

Mrs. Caverly testified the blasting "seems to give a peculiar feeling in our eardrums, and the sensation is that the foundation is just rocked under our feet." Blasts have startled her guests. On one occasion during a blast a vase fell from a table and a banjo clock fell from the wall of the breakfast room and smashed. She complained to the police. On several occasions during severe blasts, glasses filled with water spilled over. She recalls a blast in November, 1938, when the house rocked. She was lying on the davenport when it occurred and her dog jumped and began to howl. She testified that new maids become hysterical when they first experience the blasts, and that it takes time for them to quiet down.

Mrs. Bertha Osder, who resides at 256 Underhill Road, testified that when she experienced the first blast she thought the oil burner had exploded. Shortly before Labor Day (1939) there was a severe blast and simultaneously therewith a mirror fell to the floor and broke. She produced part of the broken mirror. She also testified that the vibration "scattered the ashes from the fire place on the rug."

Mrs. Lauderbach, who resides at 205 Harding Drive, testi-

fied that "The medium sized blasts sound * * * as if there was an explosion of the boiler in our basement, and the very heavy blasts are like an earthquake." She is familiar with earthquakes having lived in Los Angeles during the Santa Barbara earthquake of 1926. She says that when one of these blasts occurs "the windows, of course, and the doors, everything movable vibrates and rattles." According to her, the blasts "have been a great deal more frequent, and there have been more severe ones in the last two years." On one occasion, when she was entertaining, a blast went off and "one old lady whom I had for luncheon collapsed, really she had to lie down and have a drink of water." She further testified that although cracks throughout the house have been refilled, they "have reopened and gotten larger and been repaired." The bathtub in the rear bathroom has repeatedly pulled away from the wall and has had to be repaired three times. During the test blast on April 26th, "the kitchen globe fell to the floor and broke in pieces."

Mrs. Rogers, who resides at 449 Twin Oak Road, testified that during blasting "the house shakes on its foundation * * * and I have heard at times particles of plaster falling in the walls and the chimney." The blasting has been more severe in recent years. On one occasion following a severe blast, she heard "a thud" and found that "the large mirror had fallen to the floor" and in doing so struck a pedestal and was damaged. In November, 1938, she entertained some guests, including a gentleman who had been ill. At dinner there was "a terrific blast * * * the guests thought it was an earthquake and I felt very fearful for the effect that it had on this gentleman. He was very much frightened, of course, and it was very embarrassing to me." She testified to the existence of many cracks in the foundation walls and upper structure. These cracks she said "seem to be opened larger." Although she has redecorated the house several times, and filled the cracks, "they opened up in the same place." Both test blasts set off on April 14th rattled the house, the windows, and doors.

Mrs. Lee, who resides at 430 Tillou Road, testified that she was taking a nap when the "Thanksgiving Day Blast" was

set off, and that the shock was so great that she "almost fell out of bed." The jar was so violent "that a fork and spoon fell down [from notches in a Welsh dresser] * * * and took a big piece of glass out of the dresser." This was the most violent blast which she had experienced, but "they had been getting worse all of the time up to that point" and they became more frequent during the last two years. These blasts disturb her and her aged mother who lives with her and they make her mother very nervous. The blasting scares her dogs and they run behind chairs. The test blasts were nothing like the "Thanksgiving Day Blast." At the time she moved into her house, it was redecorated completely, but since then many cracks have appeared.

Mrs. Graham, who resides at 237 Underhill Road, testified that she was "greatly annoyed by the blasting and terrified by some of the heavy blasts. It makes us very nervous. * * * We can feel the vibration. It is a very heavy shock." At one time during a blast, a lighting fixture fell off the wall. On another occasion a window shade flew up during a blast. At another time "a small board which hides the framing to the bathroom * * * fell down with a bang, when a blast went off." When the lighting fixture fell she telephoned the police and fire departments. Shortly thereafter the manager of the quarry came running up the steps and "asked me to please not telephone the village authorities any other times. If I had any complaints to please register them with him, because he did not wish them to go into the village record, and that the Kernan quarry people would be only too glad to repair the damage that I had suffered through the blast." The test blasts held on April 14th shook her house and during one of them the window shade flew up. When she moved into the house, she had it completely redecorated and there were no cracks visible, but that since then many cracks have appeared all over the house, including the foundation walls. She knows from actual measurement that the cracks increased in length, and are widening.

Mrs. Greene, who resides at 455 Twin Oak Road, testified that from about 1932 to the fall of 1934, the quarry was not very active, and that she began to be seriously annoyed by the

blasting about the fall of 1934, and that it got steadily worse, so that in November, 1935, her husband had to complain about it to the defendants and the village authorities. She says, "when the blasts occur, the entire house seems to rise and settle down. There is a swaying motion, and it is a very terrifying thing, because it comes at totally unexpected times, when you may be quietly sitting in a chair and resting and you suddenly feel yourself lifted. You are lifted up and settled back again and you expect to see or hear something crumbling around you. And many times it has happened when I have been in the library or living room, both rooms being wood-paneled, and we can hear the wood creak and groan, and * * * little things rattle and move around." She recalls an occasion when a blast went off while she was entertaining guests, and "they were all extremely startled, and I suffered great embarrassment in explaining what it was." On another occasion a violent blast went off as a little girl was crossing the street to play with Mrs. Greene's daughter, and "I saw her [the little girl] put her arms out and spread her feet apart just though to balance herself * * * and she balanced herself and caught herself and then came racing into our house, and she was as white as could be and trembling, and it was quite a severe blast, and we felt it very intensely, the whole house shaking."

Mrs. Greene was in her library when the "Thanksgiving Day Blast" occurred "and I literally felt myself lifted bodily up and placed down again. The whole house seems to quiver and shake and particularly the library which is wood-paneled. It was very frightening * * *, and we were all very much upset for quite a while after it."

In September, 1938, Mrs. Greene awarded a contract to waterproof the exterior foundation walls of her cellar because of water seepage due to development of cracks therein. This work was completed on October 4th, 1938. There were no cracks in the waterproofed walls when they were last observed on or about November 21st. On the morning following the "Thanksgiving Day Blast," Mrs. Greene discovered that the waterproofed walls were cracked into hundreds of diagonal "criss-cross cracks," resembling a jig-saw puzzle, the walls

facing the quarry showing the worst and greatest number of fractures. Pieces of plaster were also broken off near the lighting fixture in the cellar recreation room, and a new crack was discovered in the hall on the first floor.

W. Ray Cummings, who resides at 78 Crest Drive, overlooking the quarry, testified that during blasting "The house continues to be vibrated * * * there is a tremendous noise and shaking, and pots and pans rattle." Referring to the test blasts on April 14th, Mr. Cummings says that "when the first blast took place * * * I also heard some lids of cooking utensils on the stove rattle, and I heard the windows rattle, and, of course, I felt the very decided vibration of the house." When the second blast took place "there was * * * a very decided jar to the cellar floor, an upheaval effect, resembling what I would describe to be an explosion which took place somewhere under the floor." Neither of these blasts compared with the severity of the "Thanksgiving Day Blast." When the latter blast took place, he was in a bedroom upstairs "and it was a tremendous shock. I was sitting on the bed * * * and the house shook to the point where the bed made a slight creak."

Mr. Cummings further testified that although his house rests on rock, cracks have developed in the floor and in the wall facing the quarry, and that they have widened materially. He also recalls that in the summer of 1937 there was a blast which sent several small stones over on to his property. Mrs. Cummings in her testimony corroborated her husband.

Mrs. Walowit, who lives at 158 Mayhew Drive, formerly resided in the Philippine Islands and while there experienced earthquakes. During the test blasting on April 14th she was sitting in her library "when there was a terrific shock of the whole building, and I felt the vibration of the chair very distinctly and for a moment I was stunned * * *. The second blast was not as severe as the first." She experienced another blast in the summer of 1939—"I was doing some writing when a terrible blast, well, I could best describe it as one of the severe earthquakes that I felt in Manila * * *. Yes, we had earthquakes very often, and the closest I could describe the shock is an earthquake. And at that moment

I was stunned. The chair vibrated, my desk shook, and the nurse from upstairs, who was up there with the child, came running down, her face was as white as her uniform; she didn't know what happened." She was "too frightened to finish her letter." Around election day in 1939, Mrs. Walowit was upstairs dressing when a terrific blast went off and "I thought my room was going to split in half." She telephoned the police and fire departments.

Mrs. Walowit further testified that cracks developed in her foundation walls, causing water seepage "on the quarry side;" that she had the cracks repaired, and the walls waterproofed and that "now the cracks seem to reappear again."

Other witnesses gave similar testimony.

The complainants also produced experts. Alvin L. Reufer (whose testimony was taken by deposition) is a construction and blasting engineer and a consultant to excavation contractors and insurance companies relating to blasting problems and damage arising therefrom. Speaking of the effects of vibration produced by blasting, Mr. Reufer said, "These movements jar the house, and this jarring produces stress and strain upon the structure, which may cause cracks and fractures." According to him, the explosion of dynamite also sets up air vibrations which exert air pressure against the walls of the structure, and this pressure, if great enough, may shatter or crack windows or do other damage, depending upon the degree of concussion. He was stationed in the cellar of the Herdman home on April 14th, 1939, when two test blasts were set off at the quarry. When the first blast went off "there was so much vibration that a banjo which was on the piano vibrated sympathetically." The second blast also produced vibration. Mr. Reufer expressed the opinion that the first blast would have produced more vibration if the hole had not been drilled near a fault zone, which permitted some of the gases to escape. Mr. Reufer was stationed in the Greene home on April 26th, 1939, when a 125-pound blast went off. According to him, "there was a distinct horizontal movement and a severe shock. I felt it in my hands and I felt it in my feet, and two pencils which Mr. Greene had stood on end * * * both toppled to the floor." According

to this witness none of the homes can withstand the repeated shock and vibration such as he experienced, and that vibration resulting from blasting produced the cracks in the foundation walls and upper structures which he found in said two homes. He inspected seventeen homes of the complainants, and says he was impressed by the fact that so many homes showed the same sort of damage, that the foundation walls facing the quarry showed a larger number of cracks, that the same type of cracks appeared in the foundation walls, regardless of the material out of which the foundations were constructed, and that many cracks, which had been repaired, had broken open. After eliminating cracks which may have been due to causes other than blasting, he testified that the cracks in the cement block walls and cement floors of those houses founded on bedrock, were caused directly by vibration due to quarry blasting, and that the majority of the cracks in the foundation walls of those houses located on the side of the hill, arose from a combination of direct and indirect results of the vibration. In his opinion these cracks resulted from repeated shocks, which gradually weakened the walls, structures, and frames and finally ruptured them causing the cracks to appear at the surface.

Leslie D. Long is a testing and consulting engineer on building materials and who planned various types of buildings to withstand earthquake tremors prevalent in Cuba, examined about seventeen homes of the complainants, and arrived at the same conclusion as Mr. Reufer did. Mr. Long was present in the cellar of Mr. Cummings' house (73 Crest Drive) on April 14th, during two test blasts, and experienced the vibration of the building. In his opinion none of the homes can withstand such repeated shocks, without sustaining damage.

Harold F. Hansen is an architectural engineer, and has had practical experience with the effects of blasting operations on structures, having participated in a series of blasting experiments conducted in mining areas. He inspected about fifteen homes of the complainants, found that most of the damage appeared on the walls facing the quarry, that many of the cracks were similar to the cracks caused by the mining

operations previously mentioned, and expressed the opinion that they were caused by the quarry's blasting.

On April 14th, 1939, he stood in the Greene cellar when the two test blasts went off. During the first blast he felt a hard shock in his feet, and vibration in his hands, which were resting on the foundation walls. He ascribed the cracks in the Greene cellar to vibration caused by blasting. Other experts gave substantially the same evidence.

The defense under this issue was directed to disprove the complainants' claims of physical damage to their property. In support of this defense, the defendants called six experts, among them, Mr. Dalzell, an architect, Mr. Waldron, a practical builder, and Mr. DiStasio, a structural engineer. After inspecting certain homes of the complainants, they expressed the opinion that the cracks therein were due to natural causes, settlement and poor construction. No one of these experts experienced a single blast in complainants' homes. No one of them explains how it is that houses which have settled, and which, after having the settlement cracks repaired, should suddenly, after an interval of time again show cracks. Nor do any of them explain how it is that in these various houses built at different times, and generally of good construction, there is such uniformity not only in cracks, but of types of cracks. Their opinions that all the cracks are due to natural causes, &c., lack persuasion.

Mr. Russell, an expert in the use of explosives and who is connected with the duPont Powder Company which sells dynamite to the quarry also testified for the defendants. He never experienced a blast in any of the homes of the complainants. He admitted that the blasting at the quarry with 300 pounds of dynamite will communicate perceptible vibration to the homes of the complainants, but expressed the opinion that the magnitude of such vibrations would not cause damage.

Dr. Rockwell, another of defendants' experts, expressed the opinion that the magnitude of vibration caused by a 300-pound blast, would not crack plaster. He attempted to root his opinion in the vibrograph records of the test blasts made by Dr. Schrader. The value of his testimony is doubtful,

because, as pointed out by Professor Leet, a witness for complainants, those records are defective and ambiguous, and do not contain sufficient data from which a sound scientific conclusion may be drawn. The most that can be said for these vibrograph records is that they indicate a degree of motion at one point in the structure which may or may not be at or near a "nodal" (neutral) point of the vibration wave. They do not show the relative motion of different parts of the house, or the accelerations or distortions or damage to the structure. The mathematical formula employed by Dr. Rockwell is unworkable according to Professor Leet, since it contains unknown quantities whose values are not furnished by the vibrograph records. The statistical data respecting the amount of force necessary to crack plaster, used by Dr. Rockwell, it seems to me is inapplicable here, because it does not appear that the plasters in the complainants' homes are similar to those from which the data was gathered; because none of this data applies to cement block, or brick or concrete foundation walls; and, as pointed out by Dr. Leet, these figures represent results of single non-vibratory (static) forces. Then, too, such expert testimony disregards the facts testified to by the complainants and is therefore subject to the same criticism voiced by the Court of Appeals of Maryland in the case of *Longley* v. *McGeoch, 115 Md. 182; 80 Atl. Rep. 843,* a quarry nuisance case, wherein the court said: "Mr. Sinton is an officer in a corporation operating quarries, has been connected with this quarry company, and is familiar with the operation of such quarries. He testified that, with the charges shown to be used in that quarry, it would be physically impossible for a stone to travel to McGeoch's place; that the maximum distance would be 250 feet. There is no occasion to question the sincerity of these gentlemen, but their theories are confronted by the condition shown to exist upon the testimony of the plaintiffs."

I am satisfied from the evidence and my visit to the quarry that the blasting not only created a nuisance by noise and concussion through the air, but also by physically and perceptibly vibrating the homes of the complainants, and that this vibration has in fact caused damage. There have been

single blasts which have caused damage noticeable at the time, but the fact that there appears no objective indications of damage immediately following a blast is no proof that the blast has caused no damage. The damage may not always appear on the surface following a single blast. I believe that the cumulative effect of the blasts from time to time resulted ultimately in the damage to the homes of the complainants to which they testified. To use the example of Mr. Reüfer, it is like cracking a large stone with a sledge hammer. The first, second and third blows appear to make no impression, but at the next blow, a hair-line crack may appear; another blow will lengthen and widen it, and finally, after a series of additional blows, the stone ultimately cracks.

That the complainants are entitled to relief is clear both on the facts and the law.

In *Hennessy* v. *Carmony, 50 N. J. Eq. 616,* which is the leading case in this country on the subject of equitable relief against a vibration nuisance, Vice-Chancellor Pitney held (at *p. 631*) that "a vibration that causes the windows and doors of a house to rattle in their casings, and dishes on the shelves to rattle and move on one another, and the walls to crack, and is distinctly felt by persons in the house, * * * is therefore actionable" and would be restrained. His opinion concludes with the statement that he will advise a decree that the defendant be restrained "from so using his machines as to cause the complainant's house to vibrate * * *." This language he regarded as appropriate to describe the perceptible vibration complained of. The final decree in that case (Docket 15-404) restrained the defendants "from using his or their engines and machinery * * * in such manner as to cause the complainant's house to jar and vibrate * * *."

In *Wallace & Tiernan Co.* v. *U. S. Cutlery Co., 97 N. J. Eq. 408; affirmed, 98 N. J. Eq. 699,* upon the opinion below (Backes, V. C.), there was an application to enjoin the operation of an engine which "so shakes an adjoining business property that it seriously interferes with the proper conduct of the business" (headnote). There was not in that case, as there is in the case at bar, a claim of physical injury to the adjoining property. The work carried on in the adjoining

property was of a technical nature requiring quiet. The effect of the vibration was to disturb the efficiency of the employes. It was in that case that Vice-Chancellor Backes said (at *p. 412*), "Community vibrations must be endured, but vibrating a community is a nuisance." The final decree in that case restrained the defendants of and from so operating their engine "* * * as to cause in the aforesaid factory building of the complainant the vibration complained of in the bill of complaint, or so as to cause the said factory building of the complainant or any part thereof to vibrate." This case holds therefore that perceptible vibration will be restrained even though it does not cause physical damage. In *46 C. J. 683* § *61*, it is said "The jarring of a person's premises, or the causing of vibration therein, may be a nuisance, even though it causes no actual structural injury."

A case directly in point is *Blackford* v. *Heman Construction Co. (Mo.) 112 S. W. Rep. 287*. In that case the court enjoined the operation of defendant's quarry, which had resulted in the casting of stones on complainants' property and the jarring and vibrating of buildings. There were the usual loud blasting and noises from stone crushers. In speaking of the relative rights of the complainant and the quarry, the court said:

"Although defendants have, beyond a doubt, the right to quarry stone on their property, the plaintiff enjoys the right to the undisturbed possession of his home. If those rights conflict, *the right to operate the quarry must yield to the latter, which, in the eye of the law, is the more important of the two* * * *."* (Italics mine.) The injunction in that case, among other things, enjoined the defendants from "operating such quarry or permitting the same to be so operated as to jar the buildings on the plaintiff's said lot, or to cause the same to shake and vibrate." On appeal, the defendants attacked that portion of the decree which restrained them from vibrating on the ground that it was impossible to prosecute their business without causing vibration. In overruling this argument, the appellate court said (at *p. 291*):

"The argument advanced against this portion of the decree

is that the employment of the word 'vibrate' therein operates to effectually enjoin the operation of the quarry. It is said that it is impossible to prosecute work at the quarry without causing the plaintiff's house to vibrate, and that the decree should be modified by inserting the words immediately thereafter, 'to his injury or damage.' The argument must be examined with respect to the facts in proof. The word 'vibrate' is defined by the 'Standard Dictionary' as follows: 'To give a rapid, swinging or oscillating motion; to move to and fro, especially with a quick motion; move or swing back and fourth; oscillate.' Now it is certain that the word 'vibrate' awards to the plaintiff the measure of relief only to which he is entitled. By reference to the facts * * * it appears the vibrating * * * caused plastering to fall * * * bricks to work loose and fall * * * and the mortar to crumble from between the bricks in the walls. It therefore appears the vibrations contemplated by the decree entailed a substantial injury to plaintiff's property. The principle of equity invoked is available to prevent the identical injury mentioned. When we consider that the swaying or oscillating of brick walls with a quick motion, as given in the definition of the word 'vibrate' above referred to, essentially entails such result, it seems certain the argument advanced is unsound. *If the quarry cannot be operated without causing plaintiff's house to thus vibrate, then its entire operation should be perpetually enjoined. No doubt the business can be successfully prosecuted without such vibration by employing a lesser quantity of explosives.*" (Italics mine.)

In *Barrett* v. *Vreeland* (*Ky.*), *182 S. W. Rep. 605,* the operation of defendant's quarry athough 780 feet from the nearest house, resulted in the casting of stones on plaintiff's property, and shaking "their houses upon their foundations like an earthquake would do," knocked the plaster from their walls, and put their families in fear of their lives. In that case the court granted an injunction against blastings in such a manner as (at *p. 607*) "would jar the houses of the plaintiffs, or any of them—'to such an extent as would interfere with the comfortable or reasonable enjoyment of their homes or houses; or to cause said houses, or any of them, to vibrate

or shake; or to cause the plastering or tiling, or other covering of the walls or ceiling * * * to crack or fall or be in any way damaged; or cause other injury to any of said houses; or cause rocks or dirt * * * to be thrown on the property of the plaintiffs or any of them.' "

A similar injunction was sustained by the Kentucky Court of Appeals in the recent case of *Rogers* v. *Gibson, 267 Ky. 32; 101 S. W. Rep. (2d) 200 (1937)*. There, as here, the defendants sought to disprove damage by similar expert testimony, but the trial court said: "The best test of cause is effect. I remember an aerodynamic lecture by a recognized authority whose bluntness and wit made for clarity. Speaking of fallibility in projecting flight performance by instrumental test, he said 'Take the bumble bee, apply to him the recognized aerodynamic tests. From the size, shape and weight of his body, in relation to total wing area, he cannot possibly fly. But the bumble bee does not know this, and he goes ahead and flies anyway.' Results, though not infallible, are the best test."

In *Fagan* v. *Silver (Mont.), 188 Pac. Rep. 900*, the court restrained the operation of a quarry as a nuisance.

The extent to which courts have gone in restraining quarries from operating in a residential community is best illustrated in the case of *Lademan* v. *Lamb Construction Co. (Mo.), 297 S. W. Rep. 184*. The court in permanently enjoining the operation of the quarry said (at *p. 186*):

"* * * the evidence, nevertheless was conclusive that during the period of the operation of the quarry by such defendant the dust and smoke were offensive; that the blasts were loud and deafening, producing sufficient vibration to cause dishes to rattle and to be broken; that rocks were thrown from the quarry upon the buildings; that the grinding noise from the crusher was continuous; that the blasts disturbed the sleep of children and caused adults to become nervous; and that plastering was caused to fall, and cracks to appear in the walls of the buildings. * * *

"We appreciate that the operation of a quarry is not a nuisance *per se,* although it may easily become one when carried on in a residential district. *City of St. Louis* v.

*Atlantic Quarry and Construction Co., 224 Mo. 479; 148 S. W. Rep. 948.*

"Here, the matters complained of and recited above appear to us to have been of such real and substantial character as to impair the ordinary enjoyment of the lives and property of persons of average and normal sensibilities; and we are convinced from the evidence that the quarry, located as it is in a residential district, cannot be operated in such manner as not to constitute a nuisance. While the learned chancellor originally saw fit to permit the operation of the quarry to continue under certain restrictions, it appears that he also finally came to the same conclusion we have reached herein, because in a subsequent contempt proceeding (*Lademan v. West St. Louis Quarry Co. (No. 19772), 297 S. W. Rep. 187,* growing out of this proceeding and decided herewith), he found this defendant guilty of contempt for violation of the injunction theretofore issued, and, as a part of the punishment meted out, ordered that such defendant be further restrained from operating the quarry in question. As we view the case, such order should have been incorporated in the original decree."

The injunction in that case permanently enjoined and restrained the defendants "from blasting of rock, grinding of rock, crushing of rock, or doing any other things in connection with the operation of a quarry on said described property."

The defendants lay stress on the fact that they hold a permit from the village of South Orange, permitting them to use explosives under an ordinance regulating the use of explosives. This, however, constitutes no defense. The privilege to use explosives does not justify the use of it in such a manner as to constitute a nuisance. Indeed, it is beyond the power of the municipality to authorize the maintenance of a nuisance. *Laird v. Atlantic Coast Sanitary Co., 73 N. J. Eq. 49; 67 Atl. Rep. 387; McAndrews v. Collerd, 42 N. J. Law 189; Beach v. Sterling Iron and Zinc Co., 54 N. J. Eq. 65; 33 Atl. Rep. 286; affirmed, 55 N. J. Eq. 824; 41 Atl. Rep. 1117; Atwater v. Mayor, &c., of Newark, 7 N. J. L. J. 176; Jones v. Kelley Trust Co. (Ark.), 18 S. W. Rep. (2d) 356* (quarry case).

### Noise.

The evidence of the complainants clearly establishes that in addition to the noise from the blasting, from and before seven A. M. until about four-thirty P. M., the noise emitted by the operation of the stone crusher, steam engines, well drills and other machinery, and the loading of stone precludes the possibility of normally conversing in the houses in the neighborhood when the windows are open, and that the noise penetrates the homes with the windows closed, and that the noise has made the complainants sick and nervous and has deprived them of the comfortable use of their homes and premises.

I will not here again detail the evidence of the twenty-three witnesses who testified to the noise from the operation of the quarry. I was at the quarry for the greater part of a working day when it was fully operated for my benefit. Suffice it to say that the evidence, plus what I saw and heard satisfies me that the claim of complainants is entirely justified.

With respect to the noise nuisance, the defendants called five witnesses: John W. Howie, lives at 13 Hoskier Road. He leaves his home for work about seven-fifteen A. M. Marie Howie, his wife, says that the noise doesn't bother her. Helen V. Schwartz, who lives at 73 Crest Drive, testified that "Like other noises I may have become accustomed to it and do not hear it." Clinton W. Clause, who resides at 231 Harding Drive, testified that the noise does not bother him, and that he is not at home a great deal. Edward McDonough says that he is not bothered by the noise. He is home during the day only occasionally. At most, the testimony of these witnesses is only of a negative character, and does not disprove the affirmative testimony of the complainants' witnesses. *Seligman* v. *Victor Talking Machine Co.*, 71 *N. J. Eq.* 697; 63 *Atl. Rep.* 1093; affirmed, 72 *N. J. Eq.* 946; 73 *Atl. Rep.* 1118; *Rausch* v. *Glazer*, 74 *Atl. Rep.* 39 (not officially reported); *First Methodist Episcopal Church* v. *Cape May Grain and Coal Co.*, 73 *N. J. Eq.* 257; 67 *Atl. Rep.* 613; *Reilley* v. *Curley*, 75 *N. J. Eq.* 57; 71 *Atl. Rep.* 700; *Kroecker* v. *Camden Coke Co.*, 82 *N. J. Eq.* 373; 88 *Atl. Rep.* 955.

The defendants now concede that the whistle is not necessary and that they can get along without it. The blowing of a factory whistle, which is not necessary in the successful prosecution of a business, and is a source of annoyance to persons living in the neighborhood, may be enjoined as a nuisance. *Meeks* v. *Wood, 66 Ind. A. 594; 118 N. E. Rep. 591; Butlerfield* v. *Klaber, (1876), 52 How. Pr. (N. Y.) 255; Hill* v. *McBurney Oil and Fertilizer Co. (1901), 112 Ga. 788; 38 S. E. Rep. 42; MacKenzie* v. *Frank M. Pauli Co., 207 Mich. 456; 174 N. W. Rep. 161.*

The character and volume of the noise which complainants and their witnesses say is produced by the blasting of rock, the rock crusher, the well drills used for boring of holes, the dropping of stone into the trucks and hopper and the steam engines, singly and in concert, I find as a fact clearly constitutes a nuisance. Such noises were restrained in *Fagan* v. *Silver, supra* (quarry case); *Blackford* v. *Heman Construction Co., supra* (quarry case); *Leeds* v. *Bohemian Art Glass Works, 63 N. J. Eq. 619; 52 Atl. Rep. 375* (steam engine); *Reilley* v. *Curley, supra* (steam engine). The noise and vibration produced by the gas engine operating the "Kern-O-Mix" plant is likewise a nuisance, which will be restrained. *Hennessy* v. *Carmony, supra; Wallace & Tiernan Co.* v. *U. S. Cutlery Co., supra.* See note *23 A. L. R. 1407,* entitled "Noise from operation of industrial plant as nuisance."

### KERN-O-MIX PLANT.

It is conceded that in the summer of 1935 when the "Kern-O-Mix" plant was established, the neighborhood was restricted to residential purposes by the zoning ordinance then and now in force. The quarry's use of its land was permitted only because that use was being made of it when the ordinance was adopted on March 18th, 1929. The establishment of the Kern-O-Mix plant was clearly in violation of the zoning ordinance, being a non-conforming use.

Now while it is true that equity will not enforce the penal laws of the state or the ordinances of municipal corporations

460

by injunction, it will act when the act sought to be enjoined is a nuisance. *Melucci* v. *Eagan, 124 N. J. Eq. 241; 1 Atl. Rep. (2d) 452; Ventnor City* v. *Fulmer, 92 N. J. Eq. 478; 113 Atl. Rep. 488; affirmed, 93 N. J. Eq. 660; 117 Atl. Rep. 925.*

The proofs established that the Kern-O-Mix business has been operated as a nuisance. The evidence establishes and my inspection confirmed the fact that the gas engine (also located in a primitive building partly enclosed) which operates the pugmill produces a roaring, humming noise, like that of an aeroplane overhead. If this were the only nuisance element in the case, the complainants would be entitled to an injunction prohibiting the operation of the Kern-O-Mix business under the doctrine laid down in *Melucci* v. *Eagan, supra.*

In addition, the evidence establishes that the "Kern-O-Mix" plant and product also emit a disagreeable and nauseating odor, which penetrates the homes of complainants in the warm and humid weather and when the wind is blowing in an easterly direction, making them uncomfortable.

Elizabeth G. Kernan's answer to the amendment to the bill admits (paragraph 2) that in the manufacture of "Kern-O-Mix" "crushed stone * * * stone dust, asphalt liquifier and lime" are used. Mr. Dobbins, the quarry's superintendent, admitted that they also use "tar" which is heated to a temperature of 125 degrees Fahrenheit. In the manufacture of "Kern-O-Mix" the defendants use a solvent, a product called "Rapid Curing Oil No. 2." The offensive odor of hot tar and asphalt is a matter of common knowledge; and it may readily be imagined what odor is produced by mixing it with a chemical like "Rapid Curing Oil No. 2" which has a kerosene or naphtha odor, particularly in the warm weather, when the evaporation is high.

Mr. Given testified that in the summer time, particularly when the wind and humidity conditions are severe, "we get on our property a very disagreeable odor at certain times during the day. This odor is a mixture of smells which are akin to the smell of gasoline or naphtha in part and also are akin to the smell of hot tar or from asphalt." He has also

smelled that odor from the defendants' trucks passing by loaded with Kern-O-Mix. On several occasions the odor produced nausea, when he came out of the house in the morning. It has also produced nausea upon members of his family. On one occasion his wife could not eat her breakfast because of the odor. On August 15th, 1939, the odors were very bad and he made a complaint to the police department, and to the health officer of the village. He made another complaint to the health officer in September, 1939. It is significant that the health officer was not called by the defendants. Mr. Given also complained to the building inspector about the fact that the Kern-O-Mix plant violated the zoning ordinance, but the building inspector did nothing about it. Mr. Given says that these odors were not nearly so bad in 1937 as in 1938 and 1939. Mrs. Given corroborated her husband and testified that the odor has seriously affected her, and that on one occasion it nauseated her.

Mr. Rubenson, who spent several days in the neighborhood, making a traffic check, testified that "there was a noticeable odor similar to the exhaust of an automobile engine, that is, like the fumes of a gasoline engine * * * I noticed it more on the first day I was there, which was a gray, cloudy day."

Mrs. Cumming characterized the odor as "a vile smell as though someone was burning tarry, oily rags." On one occasion when the odor was noticeable, her little girl complained of nausea. On another occasion in 1939 she complained about this odor to the village health officer.

Mrs. Caverly testified that during the past several years this odor has been very annoying to her. She described it as "an oily odor, tar and oil." Mrs. Lauderbach testified that "the odors are rank, nauseating."

Mrs. Greene testified that at first she didn't know what this odor was. "In the mornings it filtered into our breakfast room. The mornings are unusually bad * * *, and coming nearer to the quarry it was so much worse that it was sickening." On several occasions in the summer of 1939 Mrs. Greene's family could not eat their dinner on the outside terrace because of the prevalence of this odor. In the

summertime the Greene's are accustomed to use a sleeping porch on the westerly side of the house, but on one occasion last summer "it was impossible to go into that room, the smell was so nauseating and sickening that we had to move our beds out of that room and to the room diagonally opposite, at the opposite end of the house and sleep there for that evening."

Mrs. Rogers testified "to me it smells like a coal oil lamp * * * a coal oil lamp that has burned down very low. A very disagreeable odor." She testified that she smells it worse "when the wind is blowing from the direction of the quarry" and that it is worse on sultry days.

Mrs. Lee testified that she smells this odor in the morning and that "some mornings it is worse than others." She says that "one morning this summer it was very bad, the air was very heavy and I went out, coming in that direction, and it made me very sick * * *."

Mrs. Foster testified "It is an oily smell. * * * they are very unpleasant. One occasion it produced nausea."

Mrs. Graham testified "When the wind is in a certain direction and when the atmosphere is heavy, such as on sultry summer days, or in the winter when it is foggy, we get the odor from the Kern-O-Mix. * * * it is a very disagreeable odor, something like tar and oil."

Mrs. Mercy testified "We have noticed, very often we have smelled the odors from the quarry * * * similar to hot tar, I would say."

The affirmative testimony of complainants' witnesses that they are annoyed and nauseated by these odors is not disproved by the negative testimony given by the six witnesses produced by the defendants (see authorities cited on effect of negative testimony, *supra*).

In *Cleveland* v. *Citizens' Gas Light Co., 20 N. J. Eq. 201,* it was held that smoke, noise and bad odors, even when not injurious to health, may constitute a nuisance if they render the lives of the complainants uncomfortable. And so in *Meigs* v. *Lister, 23 N. J. Eq. 199,* in a case involving odors and gases a preliminary injunction went. To the argument

that the odors and gases were not constant, the Chancellor said (at *p. 205*) :

"That the nuisance is not constant, but only when the wind is in one direction, does not affect the right of the complainants to protection. They are not obliged to submit to be made uncomfortable and miserable one day in twenty, in consideration of being allowed to enjoy the other nineteen."

In *Laird* v. *Atlantic Coast Sanitary Co., supra,* we said in granting an injunction (at *p. 52*) :

"Their evidence was that in the conditions of the atmosphere and the direction of the wind, which I have mentioned, and especially and mainly in warm weather, the odor was very unpleasant, so much so that they felt constrained to close their windows and keep them closed. They were rendered uncomfortable both at their meals and when sitting in their houses and on their piazzas in the summer time.

"This situation of things is serious. They have the right to have the air come to them in a state of ordinary purity so that they can comfortably enjoy, during the hot months, the ordinary currents of air."

To the same effect see *Board of Health* v. *Lederer, 52 N. J. Eq. 675; 29 Atl. Rep. 444; Kroecker* v. *Camden Coke Co., supra; Rausch* v. *Glazer, supra; State, Board of Health of Township of Lyndhurst* v. *United Cork Cos., 116 N. J. Eq. 4; 172 Atl. Rep. 347.*

The "Kern-O-Mix" business is a type of business wholly out of place in a high class residential community of this kind.

"A nuisance may be merely a right thing in the wrong place—like a pig in the parlor instead of the barnyard." *Euclid* v. *Ambler Realty Co., 272 U. S. 365; 71 L. Ed. 303, 311.*

The complainants are clearly entitled to an injunction as prayed for. *Melucci* v. *Eagan, supra.*

The trustees of the estate of Richard L. Kernan, deceased, contend that no injunction should go against them because they leased their undivided one-half interest in the quarry to Elizabeth G. Kernan, and had no knowledge of its being operated as a nuisance.

Whether a landlord must have knowledge before becoming liable for damages for permitting a nuisance by his tenant, was raised but not answered in *Ingwersen* v. *Rankin, 47 N. J. Law 18; Quimby* v. *Filter, 62 N. J. Law 766; 42 Atl. Rep. 735*. In the present case, however, the trustees are not sought to be charged with damages. The relief sought against them is to restrain them from permitting a nuisance in the future. In a preventive action of this kind, prior knowledge is not essential. The commencement of the action is sufficient notice of the existence of a nuisance. *State, ex rel. English* v. *Fanning, 96 Neb. 1923; 147 N. W. Rep. 215 (1914)*; *Martin* v. *Blattner, 68 Iowa 286; 25 N. W. Rep. 131* (rehearing denied); *27 N. W. Rep. 244*. The owner's ignorance of the past unlawful use of his property does not relieve him of responsibility for its future use. Ownership carries its duties as well as its benefits. One of those duties is to keep the property free of nuisance. *Ingwersen* v. *Rankin, supra; Quimby* v. *Filter, supra*. The injunction against the owner is a means of preventing the continuance of a nuisance maintained by the tenant and creates no hardship beyond that created by the unlawful use of the premises which it is the owner's duty to abate. It is proper to have the owner before the court so that upon the termination of the lease, he may be affected by the court's decree restraining the continuance of the nuisance. *O'Sullivan* v. *New York El. R. Co., 7 N. Y. S. 51*. Unless the owner is joined as a party, the court's injunction could be frustrated by the landlord re-renting the premises to another tenant who might re-create or continue the nuisance.

But if knowledge were required, there is sufficient proof to warrant such finding. The quarry's operations have been open and visible to any by-passer. Knowledge may be inferred from that fact. *Cf. Quimby* v. *Filter, supra*. Then again, the evidence shows that the trustees had actual knowledge in the fall of 1934, when they were informed by Mr. Gedney, their attorney, about the agitation of the neighbors against the quarry's operation.

The trustees, however, are subject to injunction on other grounds. Paragraph 5 of the bill alleges and paragraph 4

of their answer admits that these defendants "have been and are directly interested in the development and operation of said quarry; they have leased their undivided interest * * * to the defendant Elizabeth G. Kernan, in consideration of the payment to them of royalties on all stone quarried from said property, and they have received and are still receiving royalties from said operation * * *."

This is not a case where a landlord leases property for a general use, and the tenant creates a nuisance thereon. Here, the leases expressly demised the quarry property and certain quarrying tools and equipment for quarry purposes, and the royalties reserved in the leases were to be made out of the stone to be quarried. The nuisance is the direct result of the agreed use of the land. In *Melucci* v. *Eagan, supra,* an injunction went against the landlord, as well as the tenant, because the tenant's use of the premises was pursuant to an "understanding with their lessor." See, also, *Board of Chosen Freeholders of Hudson County* v. *Woodcliff Land Improvement Co., 74 N. J. Law 355* (at *p. 361*). As owners, the trustees knew that the rock had to be blasted from the cliffs and then crushed, and that these operations involved noise and vibration, and were likely to become a nuisance to a growing residential community. *Lademan* v. *Lamb Construction Co., supra.* Where the owner leases premises with an already existing nuisance or for a purpose, the necessary result of which is a nuisance, and receives rent for them, then whether in or out of possession he is liable. *Board of Chosen Freeholders of Hudson County* v. *Woodcliff Land Improvement Co., supra; Longley* v. *McGeoch, supra; Fagan* v. *Silver, supra.*

The evidence establishes that the quarry has been operated as a nuisance prior to 1935. By leasing the premises to Elizabeth G. Kernan in 1935 and by renewing these leases in 1936, 1937 and 1938, with an already existing nuisance thereon, the trustees became liable. *Longley* v. *McGeoch, supra; Freeholders of Hudson* v. *Woodcliff Land Co., supra; Ingwersen* v. *Rankin, supra,* and *Quimby* v. *Filter, supra.* It was the duty of the trustees to take steps to abate the nuisance. Their

failure to do so and their continuing the tenant in possession was an affirmance of the nuisance.

The defendants in their brief contend that they have a prescriptive right to operate the quarry and for that reason relief should be denied complainants.

The undisputed evidence is that until about 1926 the neighborhood was uninhabited woodland. Under such circumstances certainly no right of prescription could be acquired against the owners of vacant land. *2 Wood on Nuisances (3d ed.)* § *730; Brady* v. *Weeks, 3 Barb. (N. Y. S. C.) 157, 159; Sturges* v. *Bridgman, 11 Ch. Div. 852* (approved in *Kroecker* v. *Camden Coke Co., supra)*; *Liverpool Corp.* v. *H. Coghill & Son, 1 Ch. (1918) 307.*

The law in this state and in the United States Supreme Court seems well settled that no right of prescription can be acquired to maintain a nuisance. In *Northwestern Fertilizing Co.* v. *Hyde Park, 97 U. S. 659; 24 L. Ed. 1036,* the court said:

"In such cases, prescription, whatever the length of time, has no application. Every day's continuance is a new offense, and it is no justification that the party complaining came voluntarily within its reach. * * * If population, where there was none before, approaches a nuisance, it is the duty of those liable at once to put an end to it."

This case was cited in *Board of Health* v. *Lederer, supra,* where the court said (at *p. 676*):

"It is also strenuously urged that the defendants have had possession of the premises complained of for at least twenty-eight years, and for all that period of time have been carrying on the tanning of hides and rendering of fat, and are consequently entitled to the protection of the court, notwithstanding the hazard to public health may be ever so great. Courts will be very slow to yield to such a proposition. An acknowledgment of the principle claimed would practically give to the defendants and others dominion over a very much larger extent of territory than it would be actually necessary for them to own in order to conduct their business, provided they had occupied the premises beyond the prescribed statutory period which prohibits actions to be brought by individuals.

In the case of *Commonwealth* v. *Upton, 6 Gray 473*, the court said: 'Carrying on an offensive trade for twenty years, in a place remote from buildings and public roads, does not entitle the owner to continue it in the same place after houses have been built and roads laid out in the neighborhood, to the occupants of and travelers upon which it is a nuisance.' *People* v. *White Lead Works, 9 L. R. A. 722; People* v. *Cunningham, 1 Den. 524; Fertilizer Co.* v. *Hyde Park, 97 U. S. 668; Mills* v. *Hall & Richards, 9 Wend. 315; Pottstown Gas Co.* v. *Murphy, 39 Pa. St. 257; Renwick* v. *Morris, 7 Hill 575; Wood Nuis.* § *18; Dygert* v. *Schenck, 23 Wend. 446; Sloggy* v. *Dilworth, 38 Minn. 179.*

"In addition to this, very high authority has said: 'In such cases, prescription, whatever the length of time, has no application. Every day's continuance is a new offense, and it is no justification that the party complaining came voluntarily within its reach. Pure air and the comfortable enjoyment of property are as much rights belonging to it as the right of possession and occupancy.' *Fertilizing Co.* v. *Hyde Park, supra; Wells* v. *New Haven and Northampton Co., 151 Mass. 46; Sloggy* v. *Dilworth, supra;* in note to *Chicago and Eastern Railway Co.* v. *Loeb,* see principles in harmony with this view, *59 Am. Rep. 353, 354; Hargraves* v. *Kimberly, 53 Am. Rep. 130, notes.*"

The principle had been adopted in this state as early as 1867 in *King* v. *Morris and Essex Railroad Co., 18 N. J. Eq. 397* (Zabriskie, C.). *Northwestern Fertilizing Co.* v. *Hyde Park, supra,* was also cited with approval by Vice-Chancellor Backes, in *Rowland* v. *New York Stable Manure Co., 88 N. J. Eq. 168; 101 Atl. Rep. 521.*

I have discussed this matter as if the question was properly before the court, but strictly speaking no such question is presented to the court by the pleadings. The defendants' answer did not raise this point. Nor is there any evidence to support any defense of prescription.

The defendants further argue that relief should be denied under the so-called doctrine of balancing of conveniences applied by the Court of Errors and Appeals on the former appeal in this case (*126 N. J. Eq. 343; 8 Atl. Rep.* (*2d*)

*719*). But the principle was there applied to a preliminary and not a final injunction. It is settled law in this state that the doctrine of balancing of conveniences will not be applied on final hearing, where the complainant has made out a clear case of nuisance. *Hennessy* v. *Carmony, supra; Rowland* v. *New York Stable Manure Co., supra; Higgins* v. *Flemington Water Co.* (*Court of Errors and Appeals*), *36 N. J. Eq. 538.*

Nor is the defense of laches contended for available to defendants in this case. Mere delay in asserting one's rights does not constitute laches. In a continuing nuisance of this kind "Every day's continuance is a new or fresh nuisance." *Rowland* v. *New York Stable Manure Co., supra; Board of Health* v. *Lederer, supra; Barrett* v. *Vreeland, supra* (quarry case). See, also, Note in *6 A. L. R. 1098* on "Effect of delay in seeking equitable relief against nuisance." That note cites *Carlisle* v. *Cooper, 21 N. J. Eq. 576; affirming, 18 N. J. Eq. 241; O'Hara* v. *Nelson, 71 N. J. Eq. 161; 63 Atl. Rep. 836,* and *Laird* v. *Atlantic Coast Sanitary Co., supra,* to the effect that laches cannot be interposed in the case of a continuing nuisance.

Laches certainly cannot be charged against the complainants Given, W. Ray Cummings, Wilson, who did not move into the neighborhood until 1937, nor against Mr. Bernhard who did not acquire his home until 1938.

Moreover the law is settled that a nuisance originally slight but becoming increasingly more aggravating does not estop persons affected thereby, though in laches, from maintaining a bill. *Melucci* v. *Eagan, supra.*

The defendants contend that an injunction will impair their investment in their quarry property. The evidence intended to show the amount invested is not entirely clear. Be that as it may the extent of defendant's represented investment will not deter or stay the hand of the court. *State, Board of Health of Township of Lyndhurst* v. *United Cork Cos., supra; affirmed, 117 N. J. Eq. 437; 176 Atl. Rep. 142; McCleary* v. *Highland Bay Gold Min. Co., 140 Fed. Rep. 951; Woodruff* v. *North Bloomfield Gravel Min. Co., 18 Fed. Rep. 753; Rowland* v. *New York Stable Manure Co., supra.*

To hold otherwise would be to say to the defendants if your financial interests are large enough, so that to stop you will cause you great loss, you are at liberty to invade the rights of your smaller and less fortunate neighbors.

## TRUCKS

The proofs show that the pounding and grinding noises and incident vibration from the heavy-duty trucks of the quarry and its customers going to and from the quarry, up and down the steep hills, in low gear and their frequent back-firing, has been a source of great annoyance to the complainants, particularly during the early hours of the morning, when the complainants and their families are still asleep. The testimony is undisputed that the defendants' quarry operations, and the parade of trucks begin at or before seven A. M. Mr. Rubinson, one of the complainants' witnesses who made a traffic check on May 3d, 1939, testified that from about seven A. M. to four-thirty P. M. approximately 200 trucks went in and out of the quarry. Most of them were heavy-duty trucks.

The defendants argue that the noise and vibration from the trucks is a "community vibration" which must be endured. The complainants concede that ordinary traffic noises from delivery trucks must be endured, but they deny that the quarry's trucks fall within the category of a "community vibration." They argue that the community has no interest in the quarry, and that the quarry attracts this annoyance.

But my view of the facts renders it unnecessary to decide this interesting legal question. The truck problem appears to have become acute since 1935. That the establishment of the "Kern-O-Mix" business is responsible for the trucking situation cannot be doubted. However, because of the conclusions herein with reference to the "Kern-O-Mix" plant, the trucking question becomes academic.

An injunction will go perpetually restraining the defendants and their agents, servants and employes and each of them from—

(a) Discharging or permitting to be discharged such blasts of dynamite or other explosives in the operation of the quarry owned by the defendants as to: jar the dwelling houses or other buildings of any of the complainants, or cause the same to shake and vibrate; or cause stones to be cast or thrown upon the premises of any of the complainants; or cause such noise as will occasion a nuisance, disturbance, or annoyance to any of the complainants and their families in the enjoyment of their respective houses and grounds upon which they stand.

(b) Operating or permitting the operation of the rock crusher, steam engines, drills, and other machinery and equipment upon the quarry lands, singly or in concert, with such noise as to occasion a nuisance, disturbance, or annoyance to any of the complainants and their families in the enjoyment of their respective houses and grounds upon which they stand.

(c) Doing and permitting to be done the following: Dropping crushed rock from the bins into trucks, loading trucks with crushed rock, and dropping rock into the hopper of the crusher, singly or in concert, with such noise as to occasion a nuisance, disturbance, or annoyance to any of the complainants and their families in the enjoyment of their respective houses and grounds upon which they stand.

(d) Operating or permitting the operation of their steam whistle.

(e) Operating or permitting the operation of the "Kern-O-Mix" plant and business so as to allow or permit noxious or offensive gases, odors, or vapors to be discharged, emitted, or escape therefrom or from the trucks carrying said "Kern-O-Mix" product past complainants' homes, as to occasion a nuisance, disturbance, or annoyance to any of the complainants and their families in and about their residences, and from doing any acts that may render the air in the neighborhood unwholesome, unsanitary, or uncomfortable to the complainants and their families; from operating or permitting the operation of the gas engine now used at the "Kern-O-Mix" plant or any other engines, with such noise and vibration as to occasion a nuisance, disturbance, or annoyance to any of the complainants and their families in the enjoyment

of their respective houses and grounds upon which they stand; and from carrying on or permitting to be carried on the manufacture and sale of "Kern-O-Mix" or similar products upon the quarry lands.

The defendants will be permitted to operate the "Kern-O-Mix" plant until the 15th day of September, 1940, so as to give them an opportunity to find another location to which they can remove the "Kern-O-Mix" plant and its machinery and equipment.

The defendants will also be allowed until the 15th day of September, 1940, to make necessary changes or alterations to their crusher, hopper, bins, steam engine and other quarry machinery, rock loading methods and drilling methods to eliminate, if possible, the noises complained of.