WILLIAM M. LONGLEY, IN HIS OWN BEHALF, AND ON BEHALF OF THE WILLIAM M. LONGLEY QUARRY COMPANY, *vs.* HARRY N. McGEOCH ET AL.

*Injunction; failure of bill to give address of defendant; amendments; demurrers; injunctions act in personam; jurisdiction of Court; violation of injunctions. Contempt. Nuisance; one who seeks; liability of landlord; public nuisance; injuries to private property. Blasting. Witnesses; affirmative testimony.*

An original bill for an injunction was demurred to because the prayer for process did not give the address of the defendant; on the prayer for process in an amended bill, the defendant's address was set out; on appeal, the record did not disclose whether or not there was any demurrer to the amended bill. *Held,* that the amended bill was not demurrable and that the original bill was not before the Court of Appeals for review. p. 187

An injunction operates *in personam* if the person is within the jurisdiction; it is not material that the subject-matter may be without the jurisdiction. p. 187

Where in a bill for an injunction the prayer for relief is definite and certain as to the plaintiffs named, it is not rendered vague and indefinite because it embraces other parties who are alleged to suffer in like manner from the actions of the defendant complained of. p. 187

Where the name and address of the defendant is set out in a bill for an injunction, it gives all the information that could be given if the name and address had been repeated in the prayer for process. p. 187

Blasting, such as to keep all persons on or about the premises in constant fear for and jeopardy of their lives, rendering a

proper attention to business full of fright and danger, constitutes a nuisance for which an injunction may be granted.

p. 188

A party injured by a public nuisance may apply for an injunction to prevent the same if its existence causes a substantial injury to his property or the reasonable enjoyment of it.                                                    p. 188

The owner of property can not escape liability for a nuisance thereon by leasing it.                                          p. 188

The fact that a complainant comes to a nuisance is no defense to his application for an injunction.                         p. 189

Where for a year after a preliminary injunction was granted the defendant continued to perform the acts complained of, it was *held,* that he was in contempt and that it was proper for the Court to impose a fine upon him.              pp. 194-195

One credible witness who testifies affirmatively to a fact in issue must outweigh credible witnesses whose testimony is merely negative.                                          p. 194

*Decided February 23rd, 1911.*

Appeal from the Circuit Court of Baltimore City (NILES, J.).

A preliminary injunction, prohibiting The William M. Longley Company from blasting in one of its quarries, was granted on the 21st day of June, 1910; the order was made final on the 11th of June, 1911, and the Court (NILES, J.), besides making its order final, having found that the defendant was guilty of contempt in violating the preliminary injunction, as a penalty, ordered the defendant, The William M. Longley Company, to pay a fine of $100.

The case was argued before BOYD, C. J., PEARCE, SCHMUCKER, THOMAS, PATTISON, and URNER, JJ.

*William A. Wheatley,* for the appellant.

*Alfred J. Carr,* for the appellee.

PEARCE, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court of Baltimore City, making perpetual an injunction previously granted by that Court, and also adjudging both defendants to be guilty of contempt in violating the terms of the preliminary injunction outstanding, and ordering that the defendant corporation forfeit and pay a fine of one hundred dollars as a penalty for having violated said injunction.

The three plaintiffs are residents of a suburban settlement in Baltimore County, called Rognel Heights, just beyond the western limits of Baltimore City, and are owners of real estate located there.

The defendant, William M. Longley, is a resident of Baltimore City, and is president of the other defendant, The W. M. Longley Quarry Company, a body corporate, with its principal office in Baltimore City. William M. Longley is the owner of a tract of land adjacent to the property of the plaintiffs, upon which is a quarry of stone which is operated by the W. M. Longley Quarry Company.

The amended bill of complaint alleges that this quarry is distant about 900 feet from the dwelling of the complainant, Harry N. McGeoch, and from the dwelling of the complainant, Lewis Bihy, and about 600 feet from the water works of the complainant, William T. Pfeiffer; that there are a considerable number of other dwellings on said heights occupied by the families of the owners or tenants; that prior to February 15th, 1909, William M. Longley was operating said quarry under the name of the W. M. Longley Quarry Company, blasting and exploding by dynamite large quantities of stone for sale for various uses, and that frequent complaints had been made to him of the consequence of such blasting, and that he had been notified that unless he desisted from blasting in such a way as to throw rocks and stones upon complainants' premises, proceedings would be taken to enjoin him, but he nevertheless continued to blast and to throw rocks and stones upon complainants' property, injuring the same and endangering the lives of them and their

families; that on February 15th, 1909, said Longley leased said quarry to said quarry company, which has ever since continued blasting in the same manner and with the same results almost every day in the week except Sunday, and frequently at intervals during the whole day, rendering it necessary at times for those in the neighborhood to seek some secure and protected place when the blastings are about to occur; that injury has been done to the property of complainants and others at the heights, and workmen there engaged in work have been compelled to quit their labor to avoid personal injury; that sometimes, both before and after February 15th, 1909, there was an attempt to give notice a few moments in advance of a blast, but such notice could not reach the residents of the Heights in time to enable them to protect themselves, even if the defendants could justify their blasting by such notice; that the complainants and their families cannot safely enjoy their lawns and premises or the avenues on the Heights on account of such blasting, which is a constant menace to life and limb, and an injury to their property rights for which there is no adequate remedy except in equity.

The prayer of the bill is, for themselves, and all others interested therein, and who may be made parties to the proceeding, for a perpetual injunction against each of the defendants prohibiting them and their servants from casting rocks and stones upon the premises of complainants and others similarly situated, and from so conducting said quarry as to interfere with the free use of the avenues and roads through said Heights by the complainants and any others entitled to use them, and for a preliminary injunction in the meantime, for the same purpose; and also for general relief.

A preliminary injunction was issued June 11th, 1909, prohibiting said defendants or their servants or agents "from throwing or casting any stone, boulder or rock upon the portions of the property of Rognel Heights, located in Baltimore County, which the complainants and others similarly sit-

uated are entitled to use and occupy, and from the use of
what is known as mud blasting, or from in any manner
menacing or endangering the safety of the complainants,
and all other persons residing in Rognel Heights and from
carrying on the operations of said quarry so as to interfere
with the free use and passage by the complainants and all
other persons on said Heights of the avenues and roads lead-
ing through said Heights, until the further order of said
Court in the premises.

The original bill was filed by Harry N. McGeoch alone
against Wm. M. Longley alone. To that bill a demurrer
was interposed by the defendant on March 12th, 1909, and
while that was pending, Wm. T. Pfeiffer and Lewis Bihy
were by order of Court made parties plaintiffs. The grounds
of the demurrer were three in number: First, that the quarry
was wholly in Baltimore County, and, therefore, the Circuit
Court of Baltimore City was without jurisdiction; second,
that the prayer for relief was vague and indefinite and seeks
the aid of a Court of Equity for persons unnamed and not
parties to the cause; and third, that the prayer for process
was not in accordance with section 147 of Article 16 of
the Code, and, therefore, bad in substance. This demurrer
was overruled May 12, 1909, and a preliminary injunction
granted, which was afterwards, on June 4th, dissolved, it
then becoming known that the quarry had been leased to
the quarry company on February 15th, 1909, and it was,
therefore, a necessary party. Thereupon, with leave of
Court, the amended bill was filed on June 11th, making the
W. M. Longley Quarry Company a co-defendant. It does
not appear from the Record that the demurrer to the original
bill was renewed to the amended bill, and we should not,
therefore, notice it, but for the fact that the appellee in
his brief has devoted several pages to its discussion, which
suggests that it is possible the demurrer was again inter-
posed, there being no docket entries embraced in the Record,
and we shall, therefore, briefly consider it as if renewed to
the amended bill, in which the prayer for relief is unchanged,

but the prayer for process contains the name and residence of Wm. M. Longley, and the name and place of the principal office of the defendant corporation.

First.—Injunction operates *in personam.* If the person is within the jurisdiction it is not material that the subject matter may be without the jurisdiction. This is the general rule, *22nd Cyc,* 906; *Miller's Equity,* section 570; *Phelps' Juridical Equity,* p. 307; *Carroll* v. *Lee,* 3 G. & J. 504; *Dorsey* v. *Omo,* 93 Md. 74; *Phelps* v. *McDonald,* 99 U. S. 298.

Second.—The prayer for relief is definite and certain as to the plaintiffs named, and is not rendered vague and indefinite because it embraces such other residents of Rognel Heights as are alleged to suffer in like manner from that blasting complained of, and who may appear and be made parties to the proceedings. Such a prayer ought not to be condemned as bad practice.

Third.—In the prayer for process in the amended bill, the third ground of the demurrer was met and obviated by setting out the name and residence of each defendant, and, treating this demurrer as to the amended bill, it was clearly correctly overruled. Regarded merely as going to the original bill, it is not before us for review, and we are not called on to decide it now, though we may say the original bill, in its second paragraph, gave the name and address of the then sole defendant, and thus gave all the information that would have been given if repeated in the prayer for process. *Webb* v. *Ridgely,* 38 Md. 364.

Both defendants answered the amended bill at length, each denying that it ever conducted the blasting at the quarry in such manner as to cause rocks and stones to be thrown upon other premises than their own, or to endanger the lives of any of the residents of Rognel Heights, or to in any manner injure the complainants' property. A great mass of testimony was taken before Judge Niles in open Court, who, after argument, filed an opinion in which he made no reference to the law of the case, but treated it as dependent wholly upon the facts, and made the injunc-

tion perpetual, and imposed the fine for contempt as before
stated. The appellants' counsel apparently concurred in the
view that there was little law in the case, since he devoted
31 of the 33 pages of his brief to a statement of the facts
alleged in the pleadings, and to a recital and analysis of the
evidence. The appellees' counsel, however in his brief has
cited very fully the authorities, and we shall make brief
reference only to such as declare the well recognized legal
principles applicable to this case.

In *Scott* v. *Bay,* 3 Md. 444, it was held that where blasting
was such as to keep all persons on or about the premises in
constant fear and jeopardy of their lives, rendering a proper
attention to business full of fear and danger, it would con-
stitute a nuisance. In *Hamilton* v. *Whitridge,* 11 Md. 128,
it was held that a party injured by a public nuisance may
apply for an injunction to prevent such nuisance, if its
existence will cause a substantial prejudice to his property
or the reasonable enjoyment of it; and in *Woodyear* v.
*Schaefer,* 57 Md. 12, that where the nuisance operates to
impair the comfortable enjoyment of property, protection by
injunction must be given. In *Scott* v. *Bay, supra,* it was
held that "unless a party can show a right, either in the
nature of a presumed grant or easement, or in some other
mode, to use his property in a particular way, he cannot
use it in that particular way, if it occasions injury to his
neighbors in the quiet enjoyment of their legal rights and
privileges, and it makes no difference whether precautions
were used or not to prevent the injury complained of."

In *Dittman* v. *Repp,* 50 Md. 523, it was said, "the authori-
ties are numerous that noise alone, if it be of such a charac-
ter as to be productive of actual physical discomfort and
annoyance to a person of ordinary sensibility, may create a
nuisance, and be the subject of an action at law, or an injunc-
tion from a Court of Equity."

An owner of property can not escape liability for a nuis-
ance thereon by leasing it. "Where the owner leases prem-
ises which are a nuisance, or must, in the nature of things,

become so by their user, and receives rent for them, then, whether in or out of possession, he is liable." *Owings* v. *Jones,* 9 Md. 118; *Albert* v. *State,* 66 Md. 338; *Metropolitan Bank* v. *Manion,* 87 Md. 83.

Longley was a proper party defendant to this bill, notwithstanding the lease to the quarry company. In *Brady* v. *Weeks,* 3 Barb. 161, it was said, "The writ of nuisance goes against the erector of the nuisance, and his alienee jointly. * * * The demise in such case affirms the continuance of the nuisance, and may be said to be a continuance of the nuisance by the lessor."

The fact that the complainant came to the nuisance is no defence. *Susquehanna Fertilizer Co.* v. *Malone,* 73 Md. 276.

We have carefully examined all the testimony in the Record, and we are of opinion that the case is governed by the principles above stated and that the learned Judge of the Circuit Court properly disposed of the whole case.

There were fourteen witnesses sworn for the plaintiffs.

Frederick W. Mirk, a member of the police force of Baltimore County, testified that he worked at Rognell Heights two years, 1908 and part of 1909; "that blasting went on there most every day that was fit to work out doors, and the stones fell most every day, both large and small stones, on Mr. Bihy's place, Mr. Pfeiffer's, Mr. McGeoch's; all round the neighborhood there" * * * "you could hear them fall through the trees. I was working in the basement of Mr. McGeoch's house, and a blast went off and a stone fell about 50 feet from where we were standing. Mr. Longley was there. I said, did you hear that stone fall? He said it was only a small one. This was in 1908. * * * One day in February, 1909, I was working with another man putting down water pipes, and a man came up there and stood behind a tree when a blast went off, and a stone fell between him and us." This witness was a brother-in-law of Wm. T. Pfeiffer, who testified as follows: That he owned property at Rognell Heights adjoining Mr. Longley's quarry property, and had lived there fourteen years; he sold McGeogh and

Bihy the property where they live. In 1907 while he was cleaning up the ground there, the man complained to him about stones falling on his property and he complained to Mr. Longley, who always promised to have it stopped, but did not do so. He then wrote Longley and told him that his workmen did not want to stay, said it was dangerous, and they could not take the risk, some carpenters working on a shed got down and would not go back. This witness produced stones marked with the dates on which he saw them fall on his premises. He picked them up at once, marked them and put them in his safe. The afternoon of the day on which he was testifying he heard "a great big blast, and I looked at the quarry and saw these two stones rise out of the quarry and fall down about 100 feet in the road from where I stood. I picked them up at once and brought them here." The dates he named were in March, April, June and July, 1910. On April 15th, 1910, was in the water plant to pump water. Heard blast and came out to look, and a stone fell on the roof of the shed. Another time heard a whistle and knew it meant a blast, got behind a big tree, a stone struck the limb and fell close to my foot. Told Mr. Longley of these occurrences, and that he would get into trouble, but he said he did not believe those stones had come up at all. On one occasion a stone falling came within two inches of striking him. The falling of stones has continued up to last night."

Harry N. McGeoch testified that it was about 900 feet from his property to Mr. Longley's in a direct line to the quarry; that he purchased his property in October, 1908, from Mr. Pfeiffer; that the blasting was so annoying and so dangerous that in the latter part of 1908 he went to see Mr. Longley and told him it must be stopped, that it endangered the lives of his wife and child, and that if it was not stopped he would resort to the law; that his business required him to leave home in the morning and he did not usually get back before six in the evening, and that in his absence he was in a constant state of anxiety and alarm

lest his wife or child might be injured by a falling stone; that on one occasion when he was at home sick the blast was so heavy it almost threw him off the couch. He did not testify that he actually saw stones falling.

His wife, Mrs. Sadie McGeoch, testified that they moved into the house October 10th, 1908, and that she spent most of her time when the weather was fit in the garden and on the lawn, and that frequently during that fall and winter and the following summer she heard showers of stones falling through the trees and on the barn and carriage house; that on one occasion in February, 1909, she and her niece were out in the grounds, when a man came round the road shouting, and told her "you had better run, we are going to blast, and sometimes the stones come up this way and you might be hurt"; that she then went towards the quarry, and a man who said he was foreman there came to meet her, and she asked him if he sent her word to run because they were going to blast, and he said, "not you, particularly, but Mr. Longley's men are working around here, and there are a good many stones flying and they are liable to get hurt." She said the stones did not fall every day, but it was a frequent occurrence that showers of stones fell on their premises and buildings, and that it continued off and on up to the present time.

August B. Eidman testified that he was a plumber and on February 17, 1909, was working near Mr. Pfeiffer's water works, when there were three reports from blasting and a stone came through the trees and fell about 100 feet from where he was, and Mr. Mirk and Mr. Pfeiffer picked it up and showed it to him. Longley's foreman was then standing about 150 feet off.

Eugene J. Kraft, a plumber, who put in a pump and tank for Mr. Pfeiffer during March and April, 1909, testified that while he was there blasting was going on at this quarry and some stones fell in the tree near him.

Robert Robinson, a servant living with Mr. McGeoch, testified that he had been there about nine months, and there

had been a good many blasts going on, and stones falling around on the carriage house and different places, but he could not give the dates.

Mrs. Bihy testified she lived quite near Mr. McGeoch; that the first blasting after she moved there was in February, 1909, but that day she did not actually see the stones fall, but her child, who was playing in the yard, screamed when the blast came, and she ran out to know the cause. She testified to three specific occasions when she saw large, heavy stones fall during the spring and summer of 1909 upon their place, and Mr. Pfeiffer's, and said from time to time since she has frequently heard the stones falling while working in the house.

Peter F. Monaghan testified that he had lived eighteen years on a knoll opposite Mr. Longley's quarry property; that when it was first opened the loud blasting was a nuisance to himself and his family, as it was then surface blasting, but he could not say it was a nuisance now that the quarry is deeper, "as we are quite a distance from it." He said he saw one stone pass over Mr. Pfeiffer's water works and over the trees, and fell on his own knoll where he lived.

Morris R. Espey, a carpenter, worked off and on three years in that neighborhood; worked building Mr. McGeoch's house; heard blasts go off and saw stones fall; also the same when working on the house of Mr. Pfeiffer, his brother-in-law, between Sixth and Seventh Avenues, on Walnut Avenue. And again in February, 1909, at his sister's house saw stones falling through the trees around Seventh Avenue.

Jacob Christian testified he had been working at Rognell Heights about 13 months. Heard the blasting, could see the stones coming over on Mr. Pfeiffer's place, not only one place, but different places. On one occasion was in the pump-house, heard a blast, went to the door and saw a stone fall about 20 or 30 feet from the little boy.

Walter W. Pfeiffer testified that blasting went on ever since that quarry was opened; that he lived at Rognell Heights with his father until August, 1909; that he has on

several occasions seen the stones rise out of the quarry and
fall on his father's property, and frequently when walking
on the back porch has seen showers of stones fall.

The defendant called 32 witnesses in all. Of these two
were experts, Louis B. Thomas and Frank Sinton. Mr.
Thomas was manager of the Depont Powder Co., of Phila-
delphia, from which the quarry company purchased its
dynamite, and he was familiar with the quarry and with
the process of quarrying with explosives. He described it
as 60 or 70 feet deep, opening north with the breast south
in the general direction of Rognell Heights. He explained
that the object is to loosen and throw down and out into
the quarry a large bulk of stone, and, therefore, the charge
is put in the foot of the breast. He said it was extremely
improbable with the charge said to be used there that a
stone could be thrown so far as McGeoch's, or without a
charge of 2,000 pounds to throw a stone to an altitude that
would carry it laterally 500 feet; and that he would not hesi-
tate to live with his family at any part of Rognell Heights.

Mr. Sinton is an officer in a corporation operating quar-
ries, has been connected with this quarry company and is
familiar with the operation of such quarries. He testified
that with the charges shown to be used in that quarry, it
would be physically impossible for a stone to travel to
McGeoch's place; that the maximum distance would be 250
feet. There is no occasion to question the sincerity of these
gentlemen, but their theories are confronted by the condition
shown to exist upon the testimony of the plaintiffs. About
a dozen witnesses were called, residing at or near Rognell
Heights, who testified they suffered no annoyance from this
quarry, but most of these lived at a considerably greater dis-
tance, than the plaintiffs, some as far off as five or six
squares. Most of these were men absent in the city all day,
and several of these admitted that their wives and families
did complain of annoyance from the violence of the explo-
sions. Ten or twelve others were called who frequently
heard blasts and saw dust and dirt fly but had never seen

stones fall except in and close to the quarry. But, one credible witness who testifies affirmatively to a fact in issue, must outweigh a dozen equally credible witnesses whose testimony is negative merely. Two or three who had worked upon buildings there testified they had no fear of the quarry, and that the stones generally fell back into the quarry. There was also evidence that there was occasional blasting (surface blasting) by residents to remove stumps, and that two or three wells were dug, requiring blasting, but it cannot be imagined that this could account for the occurrences complained of and testified to by the plaintiff's witnesses. There was also evidence that there were two other quarries in that general neighborhood, but these were from one mile to a mile and a half from Rognell Heights, and while there was evidence that the explosions from these quarries were sometimes heard there, no one contended that these stones were thrown from them.

JUDGE NILES had the opportunity to observe the demeanor and manner of all the witnesses in the case, and in his opinion, mentions ten of the twelve witnesses for the plaintiffs whose testimony, if accepted, he held must govern the case, and he said he could see no reason for discrediting them, after he had examined the premises at the invitation of the defendant and with the consent of the plaintiffs, and the result of his examination was to satisfy him that if the stones fell where the witnesses said they did, there was plain negligence of the rights of the plaintiffs, and we concur in his decree making the injunction perpetual.

The preliminary injunction in this case was granted June 11th, 1909, and the testimony shows that the acts complained of were continued up to June, 1910, when the testimony was being taken. It is apparent from the testimony of Mr. Pfeiffer as well as from that of Mr. Longley himself, either that he actually believed the complaints were unfounded, and he would therefore be safe in disregarding the injunction, or that he did not appreciate the authority of the Court, and

the necessity for its enforcement. We must concur in the action of the Court in this respect also.

For the reasons assigned the decree will be affirmed.

> *Decree affirmed with costs to the appellees above and below.*