**STATE OF MARYLAND, for Use of PUMPHREY, v. MANOR REAL ESTATE & TRUST CO. et al.**

**Civil Action No. 3858.**

United States District Court
D. Maryland.
Jan. 5, 1949.

I. Duke Avnet and Edgar Paul Boyko, both of Baltimore, Md., for plaintiff.

Clark, Thompsen & Smith, J. Gilbert Prendergast, Walter V. Harrison, and James B. Murphy, Asst. U. S. Atty., all of Baltimore, Md., for defendants.

COLEMAN, Chief Judge.

This is a suit brought under the Federal Tort Claims Act, 8 U.S.C.A. §§ 931–946,[1] inclusive.

Section 931 of the Act [now 28 U.S.C.A. § 1346] gives a right of action on any money claim against the United States accruing on and after January 1, 1945 "on account of * * * death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant for such damage, loss, injury, or death in accordance with the law of the place where the act or omission occurred." 61 Stat. 722.

In the present case the death occurred in Baltimore and therefore the suit has been brought in accordance with the provisions of the Maryland statute commonly known as Lord Campbell's Act, Article 67, Sec. 3, Annotated Code of Maryland, which permits an action for damages for wrongful death of a husband or wife to be brought in the name of the State, for the use of either the surviving husband or wife, as the case may be.

The equitable plaintiff, widow of the deceased, is a citizen of Florida. There are two defendants in addition to the United States; one of them, the Manor Real Estate & Trust Company, is a Pennsylvania corporation doing business in Maryland, and the other, the Calvert Village, Inc., is a Maryland corporation. Plaintiff and the individual defendants are all citizens of different States. The joinder of parties is not only proper, but the jurisdiction of this Court by virtue of diversity of citizenship is clear. See Englehardt v̇. United States, D.C., 69 F.Supp. 451.

The case presents a landlord and tenant relationship and the material facts relative thereto may be summarized as follows: In June, 1943, the Manor Real Estate & Trust Company, a real estate holding company for the Pennsylvania Railroad, made a seven year lease for a nominal consideration to the Federal Housing Agency, of a row of vacant dwellings on North Calvert Street, Baltimore, for the purpose of enabling the Government to ease the housing situation created by the War emergency. Under this lease, the trust company was relieved of all obligations arising from any use of the property by the Government for housing purposes, the repairing and rendering the premises fit for occupancy,

---

[1] 1948 Judicial Code, 28 U.S.C.A. §§ 1291, 1346, 1402, 1504, 2110, 2401, 2402, 2411, 2412, 2671–2680.

as well as the duties incident to renting and operating them, being made exclusively the obligation of the Federal Housing Agency.

In February, 1946, an apartment on the second floor front of one of these houses, known as 619 North Calvert Street, was rented to the deceased, Evered W. Anderson, on a month to month basis. On January 1, 1947, the Housing Agency sub-let the premises to one Mazer.

From June, 1943, when the Federal Housing Agency took over the premises, until January 1, 1947, when it sublet to Mazer, the premises were managed and operated by Pierre C. Dugan & Nephew, a Baltimore real estate firm, pursuant to a formal agreement between that firm and the Federal Housing Agency.

On or about January 10, 1947, Mazer entered into an agreement with Calvert Village, Inc., whereby the latter became the operating managers for all of this row of houses, including No. 619. This company has continued in this capacity up to the present time.

On or about January 15, 1947, Anderson was taken ill in the apartment he had rented, and was removed to a Baltimore hospital where he died on January 23rd, of typhus fever, as the certificate of his death shows. The cause of his death is undisputed. Medical testimony was introduced on behalf of the equitable plaintiff, which is the only medical testimony in the case, to the effect that the period of incubation of the type of typhus fever of which Anderson died, namely, endemic typhus, that is, a type peculiar to a particular country or area or to a class or group of people, as contrasted with epidemic, that is, prevalent generally among those in a given area or community at the same time, varies from four to twenty-two days. It is also undisputed from the testimony that this type of typhus is transmitted to human beings only by the bite of a flea that has been in contact with rats having the disease. There is no contention in the present case that the deceased had been bitten by a rat or that if he had been, he would thereby have contracted the particular type of typhus fever from which he died; or that he contracted the disease in any place other than the premises in question.

Prior to the trial, a petition was filed on behalf of the widow, the equitable plaintiff, asking permission to amend her complaint by adding, as an additional party defendant, the aforementioned sublessee, Mazer. Argument was heard on this motion prior to the trial. On behalf of the equitable plaintiff, the contention is that Mazer is an indispensable party defendant because Calvert Village, Inc., is merely his alter ego, since it is in effect a one man corporation with only ten shares of stock outstanding, three of which shares Mazer owns, two other shares are owned by his son, and the remaining five shares are owned by members of his daughter-in-law's family. The motion, however, was denied because there is certainly substantial doubt as to whether the corporate entity, as separate from the individual entity, should be ignored in a case of this kind, particularly since, if ignored, the result would be not only to permit the bringing into the case of an individual defendant more than one year after the cause of action accrued, contrary to the express one year limitation in the Maryland wrongful death statute, but also more than twelve months after the date of the enactment of the Federal Tort Claims Act, namely, August 2, 1946, which latter date is the controlling one. The original complaint was seasonably filed, but the petition for leave to amend the complaint and join Mazer as a defendant, was not filed until October 5, 1948. See State of Maryland v. United States, 4 Cir., 165 F.2d 869, 1 A.L.R.2d 213. We find that such cases as Western Union Telegraph Co. v. State, 82 Md. 293, 33 A. 763, 31 L.R.A. 572, 51 Am.St.Rep. 464; Zier v. Chesapeake Beach R. Co., 98 Md. 35, 56 A. 385; Neel v. Webb Fly Screen Mfg. Co., 187 Md. 34, 48 A.2d 331, and Rose v. Phillips Packing Co., D.C., 21 F.Supp. 485, upon which counsel for complainant rely, are factually different from the present situation and so not to be taken as authority for a different conclusion.

The uncontradicted evidence shows that from early in the year 1927 to the end of

October, 1947, there were reported to the City Health Department only 59 cases of, and 13 deaths from, endemic typhus. The largest number of these cases occurring in any one year was 9 in 1930. Because of the absence of lice, and also invariably the presence of many rats on the premises occupied by the 59 patients shortly before their illnesses, and also because of subsequent tests, all of these cases were considered by the health authorities as being of the endemic type, such as that of which the husband of the present equitable plaintiff died. In October, 1946, after nearly three years had elapsed since a case of typhus had been reported to the City Health Department, two cases developed in the same row of houses, but not in the particular house in which the deceased in the present case was taken ill in January, 1947. During the four months following October, 1946, three other cases of typhus, not including that of the deceased, developed in this same group of houses but none in the same house in which the deceased was taken ill; and his was the only fatal case that occurred from the disease contracted in any house in this group. In four of these five other cases, the patient was never very seriously ill.

These houses are approximately 125 years old and No. 619 had been vacant for some thirty years. In the rear they are separated by a few hundred feet of open space from a railroad and truck terminal where large quantities of freight from areas of the country where endemic typhus is comparatively common, is handled. All but five of the sixteen houses were vacant when the Federal Government took them over and remodeled them under the Federal Homes Use program to provide housing for immigrant War workers. Each of the sixteen houses was divided into six apartments, the row thus containing a total of ninety-six dwelling units and by crowding, actually houses as many as 328 persons. All families in these apartments had access to the basements where they did their laundering and deposited their garbage in *uncovered* containers which, from the time the Andersons began occupancy under their lease, that is, February, 1946, until on or about January 1, 1947, were supplied by the Dugan firm, the rental agents for the Government. Thereafter, the containers were supplied by Mazer for a short while, and then by Calvert Village, Inc.

In remodeling this row of houses, the Government Public Housing Agency fell far short of making the basements rat-proof. It is true that between November 1, 1946, and January 1, 1947, when the Government turned the operation of the premises over to Mazer, sub-lessee, the basement windows were covered with hardware cloth (wire mesh) and springs were put on the basement doors. However, numerous openings were allowed to remain in the masonry walls between all of the basements, thus permitting rats to pass easily from one basement to another. In these basements, food attractive to rats was plentiful in garbage cans which, while supplied by the Government through its operating manager, the Dugan Company, and after January 1, 1947, by the Government's sub-lessees, were often allowed to remain in the basements, uncovered, instead of being required to be kept in the back yards, and tightly covered. Inadequate janitor service contributed to this condition, there being only one janitor and a helper to serve all sixteen houses in the block which were heated by four furnaces, which the janitor and his helper had to tend, and also act as janitor for four additional houses in another block. Water was available in the laundry trays, and rat harborage was abundant under the wooden basement floors where the laundry trays were located.

When the first case of typhus was discovered, heavy rat infestation of these basements was apparent, although there were few signs of rats invading the upper floors of the buildings. The City's sanitarians made extensive investigations and tests. 101 rats were trapped and examined. Twenty, or slightly over 18% of these, were found to be positive for the test given for endemic typhus, and all of these so-called "positive" rats had been found on these particular premises or in the neighboring railroad yards. None of the rats taken from other sections of the City and

tested, including the area directly across Calvert Street from this particular row of houses and therefore farther from the railroad yards, were positive in the tests.

In October, 1946, a few days after the first case of typhus was reported in this row of houses, the City Health Department sanitarians arranged for local and regional representatives of the Federal Public Housing Administration to accompany them in an inspection of these houses. As a result, the City Health Department recommended that rat burrows and rat runs be thoroughly dusted with D.D.T. to control rat fleas, and that additional steps be taken to destroy the rat population by the use of other chemicals. Also, rat-proofing of doors in the basements of these houses by putting metal flashing on the bottom of these doors was recommended. However, it appears from the weight of the credible evidence that these recommendations were carried out only in part, and that the results were not satisfactory to the Health Department, but since this Department considered that it had no direct jurisdiction over these premises, at least until January, 1947, because until then they were under the control of the Federal Government, it attempted to act merely in an advisory capacity without giving any orders as to what had to be done so as to comply with the City Health requirements. The local field representative of the Federal Public Housing Authority gave no specific instructions to the Dugan Company with respect to keeping the premises in proper condition, and Government red-tape, requiring higher authorization before necessary sums could be expended for rat control, complicated the situation, and caused postponement of proper remedial measures. For example, the Dugan Company was told by the City sanitarians what was necessary as early as April, 1946, but this was never done except to a very limited extent as long as the Government remained in control.

Prior to the time that Mazer took over the premises, namely, January 1, 1947, there had been in them, as we have already stated, three reported cases of endemic typhus, including that with which we are here concerned, and two more cases prior to the time that Calvert Village, Inc. succeeded Mazer as sub-lessee and operator, namely, January 10, 1947. Still, but little was done towards remedying the situation. It had been anticipated that after the first case in October, approaching colder weather would eradicate the rat fleas. However, since the rats were living inside heated basements, this did not occur, and with the development of these additional cases of typhus, it became evident to the City authorities that more prompt and effective measures must be taken, now that the Federal Government had relinquished control of the premises. The fact that as late as January 20, 1947, no really adequate steps had ever been taken by either the Government or by Calvert Village, Inc., is shown by a letter of that date sent to Calvert Village, Inc., by the Director of the Bureau of Environmental Hygiene, Baltimore City Health Department, from which we quote at length as follows: "A total of four confirmed cases of typhus fever have occurred in occupants of this block since the latter part of 1946. At the time of our visit to your office on January 17th, we informed you of the seriousness of the situation and requested you to obtain 25 pounds of 10% DDT to be used on January 18, 1947 to kill the rat fleas in order to prevent a further spread of typhus fever. You agreed to obtain the DDT and call this office. Your failure to carry out your agreement made it necessary for us to obtain the DDT in order to treat the basements of the houses on January 18, 1947.

"In view of the seriousness of the situation, it is imperative that immediate action be taken to rid the properties of the remaining rat infestation and to thoroughly rat proof the premises. Therefore, as lessee and operators of the premises 605 to 635 N. Calvert Street inclusive, you are hereby notified, in accordance with the provisions of Ordinance No. 384, Approved March 6, 1941, as amended by Ordinance No. 902, Approved March 29, 1943 and of Section 148 of Article 16 of the Baltimore City Code of 1927, that these properties have been inspected and have been found to be dangerous or detrimental to life or health.

"You are hereby ordered, in accordance with the city ordinances above referred to, to correct these conditions with the following specifications:

"1. All garbage and trash containers to be removed from the basements and stored on outside of buildings. Garbage containers to be provided with tight fitting metal lids.

"2. All wooden floors in rear portions of basement to be torn out and removed.

"3. Entire basements to be provided with concrete floors at least 4 inches thick tying in with the foundation walls.

"4. Unused basement doors at head of areaways to be torn out and openings completely closed with bricks and mortar.

"5. All openings in foundation walls on inside or outside of buildings to be closed with cement mortar or masonry.

"6. Doors and door openings leading from yards to basements to be made rat proof by flashing with metal and repair or replacement of doors and sills where necessary.

"7. Removal of all remaining double ceilings in basements and. sealing of openings leading to first floors.

"8. Prompt and continuing eradication of existing rat population as rat proofing measures are carried out.

"You are hereby notified that the above corrections are to be started by *January 24, 1947* and completed not later than *February 21, 1947*. It is recommended that you visit this office, Room 900 Municipal Building, at 10:00 A.M. on January 23, 1947 to discuss these corrections with us.

"Failure on your part to comply with this notice will make it necessary for the Health Department to take legal action in accordance with the provisions of the law."

As a result of this firm position taken by the City, its Health Department surveys conducted in March, 1947, showed that good results had been accomplished and thereafter no new cases of endemic typhus developed in these premises.

Supplementing its requirements as above, the City Health Department advised endemic typhus vaccine for persons living in this entire row of houses, and also for those whose work there might expose them to fleas. A letter was sent to each householder, warning of the danger and strongly advising him and his family to go to a private physician for vaccine inoculation, the vaccine being supplied free to physicians. But, despite these warnings, few families availed themselves of the services of a private physician. It was not until City Health Department doctors and nurses went from door to door with the vaccine that the residents in this row would agree to be treated with it. Since many, both men and women, worked either during the day or at night, and had irregular habits, it was found extremely difficult to arrange any satisfactory inoculation schedule.

The grounds upon which the equitable plaintiff seeks to recover may be summarized as follows:

First, as against the Government, it is claimed that (1) the Government learned as early as November, 1946, directly through its representatives and through its operating agency, the Dugan Company, that rat infestation existed in the particular house in which the deceased was a tenant; (2) while the Government, as a result of a study made of the situation in conjunction with the United States Public Health Service and the Baltimore Health Department, applied, through its operating agency, some remedial measures the need for which was apparent, such as spreading DDT in the premises, nevertheless, major measures, such as stopping up the holes through which the rats moved, were neglected; and (3) since the Government's representatives had learned prior to January 1, 1947, when the Government sublet the premises, that there had been, during the preceding three months, three typhus cases in this row of houses, the Government should have informed its tenants, including the deceased and the equitable plaintiff, of the risk of their contracting the disease, and should have recommended that all tenants be inoculated against it, but nevertheless, the Government did nothing in this respect.

Second, as to the sub-lessee, Calvert Village, Inc., it is claimed that (1) when it assumed control of the premises on or about January 10, 1947, the rat holes still were not stopped up; and in spite of the fact that, the premises now being under private, as opposed to Government control and operation, the Baltimore Health Department inspected them anew, and told representatives of the Calvert Village, Inc., what must be done in order to check the rat infestation or otherwise the City authorities would take summary action, nevertheless, little more was done to remedy the situation before Anderson was taken ill on January 15th; and (2) since representatives of Calvert Village, Inc., had knowledge, between January 10, 1947, and the commencement of Anderson's illness, that several cases of typhus had been discovered in this block of houses, Calvert Village, Inc., as well as the Government, should have promptly informed all of its tenants of the danger from the disease, and should have recommended that they be inoculated against it.

■ In the course of the trial, counsel for the equitable plaintiff virtually abandoned any claim against the Manor Real Estate & Trust Company, and we conclude rightly, for the reason that there has been no evidence presented on which liability of that defendant may be predicated. The uncontradicted testimony of the Baltimore Health Department experts who had given a great deal of time to a thorough study of the problem of rat infestation in Baltimore generally, as well as in this block of houses specifically, was to the effect that age, delapidation or vacancy of buildings do not, in and of themselves, attract rats, because rats are accustomed to frequent only places where they may obtain food. These premises had been unused for a number of years, most of them, including the particular house, No. 619 in which the deceased was stricken with typhus, for as long as thirty years. Therefore, unless there was some obligation on the part of the Trust Company to control, restrict or supervise the character of rehabilitation to which its lessee or sub-lessees might subject the property—an ob-

ligation which we believe does not exist in law—then there is no basis on which to place responsibility insofar as the Trust Company is concerned. Accordingly, the motion of the Trust Company for a directed verdict in its favor must be granted, there being no evidence legally sufficient to show any negligence on the part of this defendant which contributed proximately to the death of the equitable plaintiff's husband.

■ Returning, then, to the question whether either the Government or Calvert Village, Inc., or both, are liable to the equitable plaintiff, her counsel rely first upon the doctrine of nuisance as applied to a landlord and tenant relationship, which is well established to the effect that no person can lawfully create or maintain a nuisance on his premises of which he has knowledge or should have it by the exercise of reasonable care, and escape liability for damage occasioned by such nuisance to third persons. This of course embraces the principle that no lessor may knowingly create a nuisance and then escape liability for the consequences thereof merely by leasing his premises to a tenant, or to someone else for the purpose of operating them for a tenant. That is to say, if at and prior to the time of leasing premises, a nuisance exists thereon, it is the duty of the lessor to put an end to it, if he is or should be aware of it, and if he fails to do so before leasing, he is deemed to have aided and abetted a continuance of the nuisance, and is thereafter liable to a tenant for so doing. See Albert v. State, 66 Md. 325, 7 A. 697, 59 Am.Rep. 159; State v. Boyce, 73 Md. 469, 21 A. 322; Smith v. Walsh, 92 Md. 518, 48 A. 92, 51 L.R.A. 772; Miller v. Fisher, 111 Md. 91, 73 A. 891, 50 L.R.A.,N.S., 295; Mylander v. Beimschla, 102 Md. 689, 62 A. 1038, 5 L.R.A.,N.S., 316; Longley v. McGeoch, 115 Md. 162, 80 A. 843; Hart v. Wagner, 184 Md. 40, 40 A.2d 47.

Next, it is asserted on behalf of the equitable plaintiff that even though public health authorities may acquiesce in or approve of inadequate measures taken by an owner to end a nuisance, the owner or lessor is not in law relieved of responsibility merely by virtue of such acquiescence

or approval on the part of the public authorities. However, in the present case we find that, by the weight of the credible evidence, there was never in fact approval by the Baltimore Health Department of what either the Government agency or its sub-lessee, Calvert Village, Inc., did as being sufficient to meet the situation. True, some of the City Health Department's recommendations were carried out, but the weight of the credible evidence is to the effect that at least until after the equitable plaintiff's husband had contracted the disease, what was done by the Federal Housing authority in conjunction with the United States Public Health Service fell far short of what the City Health Department had recommended and urged be done, but had not attempted actually to require because of a conflict between Federal and municipal jurisdiction; and also, that Calvert Village, Inc., fell far short of putting into effect the full recommendations of the City Health Department until after the equitable plaintiff's husband fell ill.

Both the Government and Calvert Village, Inc., rely upon three defenses, as follows: (1) Since there was no agreement on the part of the Government as landlord to repair the premises so as to prevent or mitigate rat infestation, there can be no recovery for failure to do so, and that even where there is a contract to such effect and the landlord fails to carry out the contract, the tenant still may not recover any damages if, with knowledge of the condition, he chooses to remain in the premises, with resultant injury, because in so doing, he is guilty of contributory negligence. (2) Since, according to the evidence, there were at least three conditions, any one of which might have caused the rat infestation, namely, (a) failure to keep the cellar doors closed; (b) failure to put food and garbage in receptacles which rats could not enter, and (c) failure to close up holes in the walls and flooring through which rats could pass, for only one of which conditions the Government, as landlord, was responsible, namely, the last named, in order for the plaintiff to recover, the evidence must clearly show both that the deceased contracted typhus as a result of this particular cause for which alone the Government would be answerable, and also that but for this particular cause, Anderson would not have contracted the disease from which he died, and that proof in both of these respects is lacking. (3) If a landlord leases premises which are at the time in an unsafe or unhealthy condition, or which become so during the term of the lease, the landlord is only liable to the tenant for damages from such condition if the landlord is aware of it and conceals it, or if by reasonable care and diligence he could have known of it, and takes no reasonable measures to remedy such condition; and provided further, reasonable care and diligence have been exercised by the tenant so as not to contribute to such condition. Both defendants contend that proof is lacking in the present case that such was done by either Mr. or Mrs. Anderson.

Taking up these three defenses, the first and third may be treated together, because inter-related. They are a correct statement of Maryland law as announced in such decisions as Smith v. Walsh, 92 Md. 518, 48 A. 92, 51 L.R.A. 772, and Thompson v. Clemens, 96 Md. 196, 53 A. 919, 60 L.R.A. 580. However, on the facts disclosed, this principle of law cannot be taken as conclusive against the equitable plaintiff in the present case because (1) there is no specific evidence that either the deceased or his wife, the equitable plaintiff, negligently left uncovered or otherwise exposed the garbage or trash from *their own* apartment to as to attract rats; and (2) even though the deceased and the equitable plaintiff were aware of the heavy rat infestation of the premises in which they had leased an apartment, there is no evidence that they knew, nor were they under any legal obligation to ascertain, whether or not, by reason of this infestation, they were exposed to a serious, much less a fatal, disease.

On the point as to whether either Mr. or Mrs. Anderson contributed to the former being subjected to fleas that carried the typhus germ from the rats, there is nothing in the testimony from which we are justified in finding that either of them failed to place their garbage and

trash where it was not accessible to rats. There is evidence, to be sure, that there was much carelessness in this respect by tenants, taken as a whole, throughout the entire row of houses, and that as early as October, 1946, all the tenants were sent a written warning on this subject. The garbage problem was apparently aggravated by the fact, as the testimony shows, that the City had insufficient trucking facilities for removing the garbage as promptly as it should have done. However, there is no testimony that actually links either Mr. or Mrs. Anderson to the dereliction on the part of the tenants as a whole with respect to garbage, except the janitor's broad statement that the tenants in house No. 619 threw their garbage all around. There were five other families living in this same house. The janitor did not say that he ever saw the Andersons fail to take care of their garbage properly. Failure of other tenants, whether in the same house with them or not, to use due care in this respect, cannot be imputed to the Andersons.

On the point of knowledge or obligation on the part of the Andersons to find out about the danger of contracting typhus fever inherent in the rat infestation of the premises in which they lived, even though they might not be responsible for it, we believe it is sufficient to point out that up to the time of Mr. Anderson's fatal illness, neither Federal nor State Health authorities had apparently sensed the full seriousness of the condition in these premises—at least there is no evidence that up to that time they believed that the tenants should either leave the premises or be inoculated against typhus. Therefore, to charge the tenants with an obligation to take greater precautions than the trained specialists in this particular field considered necessary or advisable at the time, would, we think, be extending the doctrine of contributory negligence as applied to landlord and tenant cases to a point to which it has not been, and should not be extended.

The foregoing considerations we believe completely dispose of the question of contributory negligence. We therefore turn to what we have designated above as the second and remaining defense made to the equitable plaintiff's claim, namely, that before she can recover from either the Government or Calvert Village, Inc., she must clearly show that her husband would not have contracted typhus but for the failure on the part of either the Government or Calvert Village, Inc., to close up the holes in the walls and floors of the premises through which the rats were passing, because, as is claimed, this was the only preventive measure which either defendant can be said to have been required to take, and did not take.

An analysis of the evidence shows that both the Government and Calvert Village, Inc., were especially derelict with respect to closing the holes or passages in the partition walls and also with respect to repairing the floors and doors. It is true that these defendants cannot be charged with the duty of keeping outside basement doors closed, because obviously this could not be controlled by other than the tenants themselves who were daily using these doors. However, the weight of the credible testimony shows that these doors were not repaired so as to be rat proof when closed until the City Health Department threatened, on January 20, 1947—three days before Anderson died—to close the premises, if such were not promptly done. Also, we cannot agree with the contention of the Government and Calvert Village, Inc., that they, as landlords, had no responsibility with respect to leaving garbage and trash where it was accessible to rats. Although janitor service is not mentioned, much less defined, in the lease to the Andersons, such service in fact was supplied by the landlords, and from the weight of the credible evidence it is reasonable to conclude that the tenants were given to understand, at least impliedly, by the landlords that this service would embrace two principal things: (1) Tending the furnaces, and (2) properly caring for the garbage until removed from the premises. The weight of the credible evidence also satisfies us that this janitor service was inadequate in that there was only one janitor and a helper to perform both these duties in sixteen houses, for which there were

four furnaces to be tended, and that the garbage was not placed in proper containers outside the various buildings but was allowed to accumulate, accessible to rats inside the buildings. While the Government, through the Housing Agency, spent, according to the testimony, $220,000 in repairs and improvements to the premises after it took them over in June, 1943, it is apparent that the Agency skimped when it came to repairing the cellars in all sixteen houses in the block; and also that it failed to provide adequate janitor service. Likewise, although after Calvert Village, Inc., took over the premises from the Government within the first ten days of January, 1947, it spent approximately $8,000 on repairs and improvements, it nevertheless did not adequately repair the cellars until after Mr. Anderson's death; and also it failed, prior to his death, to provide adequate janitor service and to take care properly of the accumulation of garbage.

It is true that when several causes contribute proximately to an injury or death and each is an efficient cause without the operation of which the injury or death would not have occurred, it may be attributable to all or any of the causes, but it cannot be attributed to a particular cause unless, without its operation, the injury or death would not have occurred. Realty & Mortgage Co. v. Ulrich, 164 Md. 666, 165 A. 708, and cases cited. Applying this principle to the facts in the present case, as we find them from the weight of the credible evidence, we do not believe it can be said with certainty that Anderson would not have contracted the typhus from which he died had it not been for the negligent omissions of the defendants which we have just enumerated and analysed and which we summarize as follows: The Government, for nearly three months prior to January 1, 1947, and Calvert Village, Inc., between that date and January 15, 1947, when Anderson was first taken ill, were both negligent, that is, failed to use that degree of care required of the average reasonable person under the circumstances, with respect to (1) making adequate repairs to the basement walls, floors and doors whereby rat infestation could have been eliminated in the basement of house No. 619 under lease to Anderson and in the other 15 houses in the same block; and (2) affording to tenants, including Anderson, in house No. 619, and in the other 15 houses in the same block, janitor service adequate to keep the garbage collected in covered receptacles outside the basements of all of these houses until removed therefrom for disposal.

We are satisfied that such negligence—either or both phases of it—contributed to Anderson's contracting endemic typhus fever in house No. 619, as we find he did between December 24, 1946, and January 11, 1947, from which he died on January 23, 1947. Anderson must have contracted the disease on the premises from the bite of an infected flea some time between December 24, 1946, and January 11, 1947, since, according to the evidence, he first fell ill on January 15th, and the uncontradicted medical testimony is to the effect that the period of incubation of endemic typhus varies from four to twenty-two days. If he contracted the disease between December 24th and January 1st, then it is reasonable to conclude, as we do, that the Government contributed to his so doing, because the Government was negligent in its failure to take adequate measures for rat control during that period.

Also, if Anderson contracted the disease between January 1st and 11th, we find that the Government must still be considered as having been a cause of his so doing, because while not still, at that time, operating the premises, nevertheless, it is also reasonable to conclude, as we do, that the Government's prior negligence in failing to provide adequate rat control contributed to, or aggravated the rat infestation of the premises during that later period, as a result of which Anderson contracted the disease. However, it is, of course, impossible to determine definitely either when or in what manner the particular rat or rats that were the carriers of the disease to Anderson through the medium of a flea or fleas, entered the premises, that is, whether they entered through holes in the cellar walls or flooring

of this particular house, or through its cellar door being left open by the janitor or some occupant, including the deceased himself or his wife, the equitable plaintiff, or even some visitor. In all likelihood neither any typhus infected rats nor any fleas infected by them would have been there after November, 1946, if the Government had properly carried out the remedial measures prescribed by the City authorities, because, as shown by the report of the City Health Department's sanitarians, within a few weeks after the City stepped in and took control, with the infestation at its peak, the infestation ended and no other cases of endemic typhus have ever been known to occur in these premises. However, the particular flea or rat, or both, that caused the fatality, might have survived all proper remedial measures. Therefore, mere surmise or speculation is not enough to impose liability for negligence under such circumstances. There must be actual proof, by the weight of the credible evidence, that but for such negligence, Anderson would not have contracted the typhus fever from which he died.

 With respect to the other defendant, Calvert Village, Inc., we believe that the weight of the credible evidence is not sufficient to justify even a finding that its negligence, unlike that of the Government's was one of the causes of Anderson's contracting the disease, for the following reason: This defendant had no liability with respect to the premises prior to January 10th when, according to the evidence, it first assumed management thereof under its sublease. Yet, as we have just shown, Anderson might well have contracted the disease prior to that date as well as after. In other words, if Anderson was bitten by an infected flea before January 10th, since Calvert Village, Inc., had then nothing to do with the management of the premises, it cannot be said to have been a contributing factor in Anderson's contracting the disease. If Anderson did contract the disease on January 10th or 11th, that is to say, the last two days of the period when, according to the uncontradicted evidence, the incubation would have had to occur, this defendant could be said to have contributed thereto, because of its proven negligence in failing to make adequate provision for rat control on these specific dates. However, because of the uncertainty as to when Anderson actually contracted the disease, we must hold otherwise.

 Damages which are recoverable in law are divided into two main classes: First, direct; second, consequential. Direct damages include all such injurious consequences as proceed from or have direct causal connection with such consequences. Consequential damages are those which the cause in question naturally but indirectly produces. From these two broad classifications flow two legal principles which control and must both be satisfied in order to impose liability in the present case: (1) The wrongful act, neglect or default must have been a proximate cause of the death. It need not have been the sole cause. It is sufficient if it is a proximate cause, although another cause not amounting to an intervening or independent one contributes thereto or hastens it but, as heretofore explained, it must have been an essential cause in the sense that but for it the result in question would not have occurred; and (2) even though the wrongful act be such proximate cause of the death, the wrongdoer, in the absence, as here, of wanton or wilful conduct, is liable only if such consequences would or should have been contemplated or foreseen by him in the light of the particular circumstances; that is, if the death was a consequence which, according to common experience and the usual course of events, might reasonably have been anticipated.

Illustration of the first of the above named principles, namely, that the wrongful act, neglect or default must have been the proximate cause, or one of the several concurring proximate causes of death, is afforded by cases where death results from a disease caused by an injury; or where the injured person is subjected to unskilful or improper medical treatment; or where the injury hastens death from a prior disease or renders a prior disease fatal.

 As illustrative of the second principle above stated, namely that the

wrongdoer is liable only for those consequences which, according to common experience and the usual course of events, might reasonably have been anticipated by him, it follows that a wrongdoer is not to be held liable for consequences which arise from a combination of his fault with other circumstances which are of an extraordinary nature, unless those circumstances are such as the wrongdoer should reasonably apprehend would follow from the character of his act. A person is bound to anticipate the reasonable and natural consequences of his own conduct; that is, consequences known to him or which, in the light of common or ordinary experience, are foreseeable. See Sutherland on Damages, 4th Ed., Secs. 12–44. The rule is firmly established by Maryland law and by the weight of authority in other jurisdictions and has been applied in a long line of decisions of the Court of Appeals of Maryland. See for example, Shafer v. Wilson, 44 Md. 268; Baltimore City Passenger Ry. Co. v. Kemp, 61 Md. 74; Sloan v. Edwards, 61 Md. 89; Patapsco Loan Co. v. Hobbs, 129 Md. 9, 98 A. 239; Mt. Royal Cab Co. v. Dolan, 166 Md. 581, 171 A. 854. Suffice it to quote the following statement of the rule by that Court in the case last named, Mt. Royal Cab Co. v. Dolan, 166 Md. 581, at page 584, 171 A. at page 855: "In an action for the recovery of damages for personal injuries suffered subsequent to the commission of the wrong, the recovery is limited to those consequences which have actually and naturally ensued the tort, or which may certainly or reasonably and probably result as a proximate consequence of the act, but not consequences which are merely possible, and so speculative or conjectural."

As respects the first of these two principles as applied to the facts in the present case, as heretofore explained, the negligence on the part of the Government which we find to have occurred throughout the entire period from December 24, 1946, to and including January 11, 1947, which is the latest date when, according to the evidence, Anderson could have contracted typhus fever from which he died on January 23rd, was not such as to warrant a definite finding that it was in fact the cause or one of the causes without whose effect Anderson would not have contracted the typhus from which he died.

In view of our conclusion just stated, it becomes unnecessary to consider whether the second condition precedent to recovery has been satisfied, namely, whether even though the Government's negligence were found to have been a proximate, essential cause of Anderson's death, the latter was such a consequence of the Government's negligence which, according to common experience and the usual course of events, might reasonably have been anticipated. However, in view of the unusual character of the present case, we will consider it from this second aspect as well.

As has been pointed out, by the law of Maryland and in fact by the great weight of authority long established, even though the particular negligence, either through omission or commission, may be a proximate, essential cause of the wrong inflicted, recovery for such wrong is nevertheless limited, in the absence of wilfulness, to those consequences which have actually and naturally followed from the wrong doing, and does not include consequences which, while possible, are nevertheless speculative or conjectural.

From the evidence in the present case it stands uncontradicted that there occurred in the entire City of Baltimore for a period of more than twenty years, that is, from the first part of 1927 to the end of October, 1947, only 59 cases of the endemic or murine type of typhus fever from which Anderson died, and only 13 of these 59 cases were fatal. That is to say, during a period of more than twenty years when the population of Baltimore averaged roughly 800,000 a year, there occurred an average of less than three cases of this disease a year, or roughly one case for every 267,000 inhabitants of the City, and one death for every 520,000 inhabitants. In addition, the evidence shows that the largest number of cases of such disease occurring in the City of Baltimore in any one year during this period of more than twenty years, was 9, recorded in the year

1930. Thus, it is clear that during a generation prior to Anderson's being stricken, as shown by the medical testimony in the present case, the incidence of endemic typhus fever in Baltimore, as well as the rate of mortality from it, were virtually negligible. Furthermore, while Anderson's death represented a fatality of one out of six cases in this particular block of houses, they contained upwards of three hundred tenants, of which the six cases represented less than two per cent. Also, of the total of 101 rats which were trapped on these premises and on the neighboring railroad yards from October, 1946 to March, 1947, 81 per cent proved negative to the tests for endemic typhus given by the Baltimore Health authorities; and Anderson's case was the only one of typhus in the house in which he lived.

Thus, there is nothing in the evidence in the present case from which we would be justified in concluding that the death of Anderson as and when it occurred from this particular disease was a consequence which, according to common experience and the usual course of events, might reasonably have been anticipated. This being true, to hold the Government responsible in the present case for Anderson's death would be tantamount to declaring that even though he died of a disease which was not epidemic, which very rarely occurred in Baltimore and with respect to which, when it did occur, the death rate had been virtually negligible, the Government is nevertheless to be treated as having been under a legal duty to anticipate that his death might occur.

Every case involving the question of responsibility for death through negligence must, of course, turn upon its own individual, and often peculiar, facts. The right of the deceased and of his wife, the present equitable plaintiff, to have required both the Government and Calvert Village, Inc., to have done more than they did to abate the rat infestation, by injunctive relief through court action, on the ground of nuisance, cannot be questioned. But the right of the individual to require his landlord to abate a nuisance is not to be confused with the right of the same individual to hold his landlord responsible for *every consequence* that may flow from the landlord's failure to meet his full obligations to his tenant. Here is where we find that counsel for the equitable plaintiff in the present case have confused the issue, and have thereby sought to extend the law of damages due to negligence to a point not justified by long established principles, or in fact, by any decision of persuasive authority on similar facts to which our attention has been called.

Counsel for the equitable plaintiff rely upon such cases as Davis v. Smith, 26 R.I. 129, 58 A. 630, 66 L.R.A. 478, 106 Am.St. Rep. 691, 3 Ann.Cas. 832; Cesar v. Karutz, 60 N.Y. 229, 19 Am.Rep. 164; Maywood v. Logan, 78 Mich. 135, 43 N.W. 1052, 18 Am.St.Rep. 431. The first of these cases, Davis v. Smith, merely held that a landlord who knowingly rents premises infected with diphtheria and fails to inform the tenants thereof, is liable for injuries resulting therefrom to the tenant, his guests or his family, but the landlord is not so liable where he does not know of the infection. Cesar v. Karutz is to the same effect, where the contagious disease, knowledge of which was conceded by the landlord, was small-pox. The same is true with respect to Maywood v. Logan. That was an action to recover rent of premises leased to the defendant for a dwelling house, in which the drinking water was polluted by the carcass of a dead dog in a well, with the result that defendant's family became ill of malaria. Plaintiff's, the landlord's, attention had been called to the bad quality of the water after the defendant had taken possession of the premises; plaintiff had made an examination, had found the dog there but did not communicate this fact to the defendant. The court held that under these circumstances the defendant could recoup against the landlord the damages he had suffered, and was not limited to the actual damages sustained in procuring nursing and medical care, but was entitled to damages for all the injuries which naturally followed from the pollution of the water.

It will thus be seen that the facts in such cases as the aforegoing are clearly

distinguishable from those in the case before us in that they involved actual knowledge on the part of the landlord, *which he concealed,* of the presence of well known, highly epidemic and contagious diseases, most of them having, at least at the time these decisions were rendered, a high mortality rate.

The correct doctrine is well stated in Wood v. Wehr, 91 Mont. 280, 6 P.2d 1105, a decision by the Supreme Court of Montana, in 1932. There, the question involved was whether the owner of pasture land which he had rented to a tenant was liable to him in damages, because this land was infected with disease which infected the tenant's sheep.

The court in that case stated the applicable rule of law to be that where a landlord, with knowledge, lets premises infected with a contagious or infectious disease, and fails to inform the tenant thereof, he will be liable to the tenant for injuries resulting therefrom. Applying this rule to the facts in that case, the Court found that there was no evidence sufficient to indicate that the owner of the pasture land, at the time of leasing it, knew, or in the exercise of reasonable care, ought to have known, that the land was infected with the particular disease known as foot-rot and, therefore, the Court directed a judgment for the land owner. The Court quoted from Cutter v. Hamlen, 147 Mass. 471, 18 N.E. 397, at page 398, 1 L.R.A. 429. In the Cutter case, eight months before the tenant moved in, a child of a former tenant of the same premises had died there of diphtheria—a fact not disclosed to the tenant, although there was evidence that the landlord knew of it. Also, the landlord knew that the house had been fumigated, after the death, by the local board of health, and that the drains were defective at the time of the lease, but had misled the tenant about them. The tenant contracted diphtheria, as did other members of his family, and his son died of it. The case was appealed on exceptions to the trial court's permitting the case to go to the jury on the question of negligence on the part of the landlord causing tenant's illness and that of other members of his family, and the son's death; and also on the question of whether the tenant had been contributorily negligent. The Court held that both of these questions were properly submitted to the jury. In the course of its opinion, Judge Oliver Wendell Holmes [later, Mr. Justice Holmes of the United States Supreme Court] stated the following, which we believe is the rule by which the question of whether or not the Government is liable in the present case, must be determined, 147 Mass. 471, at pages 474, 475, 18 N.E. 397 at page 398: "He [the landlord] is bound at his peril to know the teachings of common experience, but he is not bound to foresee results of which common experience would not warn him, and which only a specialist would apprehend."

Thus it will be seen that even should it be found that the Government's negligence was such as to warrant a definite finding that it was in fact the cause, or one of the causes, without whose effect Anderson would not have contracted the disease from which he died, there still should be no recovery.

For the reasons herein stated the complaint must be dismissed. The Government's dereliction including that of its agents, was morally very great. The dereliction of Calvert Village, Inc., was also morally inexcusable, and the failure of both to co-operate properly with the Baltimore Health Department justifies strong censure, even though the proven facts do not support a legal right of recovery.